FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Lila R. Davis, | : NO. 3:01 CV 2204 (DJS) |
| Plaintiff | : |
| | : Jury Trial Demanded |
| Pilot Corporation of America, | : February 20, 2004 |
| Defendant | |

## PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS' ANSWER AND AFFIRMATIVE DEFENSES

The Plaintiff hereby objects to the Defendant's Motion for Leave to Amend its' Answer and Affirmative Defenses. The Plaintiff has attached her Memorandum of Law supporting her objection hereto.

The Plaintiff,
Lila Davis

By: 

Max F. Brunswick, Esquire
Attorney for the Plaintiff
12 Trumbull Street
New Haven, CT 06511
203/562-4024 (o)
203/782-5979 (f)

ORAL ARGUMENT NOT REQUESTED
TESTIMONY NOT REQUIRED

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| Lila R. Davis, | : NO. 3:01 CV 2204 (DJS) |
| Plaintiff | : |
| | : Jury Trial Demanded |
| Pilot Corporation of America, | : February 20, 2004 |
| Defendant | |

**PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS' ANSWER AND AFFIRMATIVE DEFENSES**

The Plaintiff hereby objects to the Defendant's Motion for Leave to Amend its' Answer and Affirmative Defenses. The Defendant claims that it should be entitled to amend its answer and affirmative defenses after recently having acquired evidence of the Plaintiff's wrongful conduct, i.e. stealing 4000 pages of documents from the defendant's premises before she was actually terminated. The Defendant concludes that this "after acquired evidence" entitles it to raise the issue that had it known of the existence of such evidence prior to terminating the Plaintiff it would have presented earlier and additional reasons to terminate her.

**I.   ARGUMENT**

The Defendant alleges that the information relating to the alleged stealing only became known following the Plaintiff's deposition on January 22, 2004. However, defense counsel negates to inform this Court that the 4000 pages were submitted by the Plaintiff's prior counsel, Attorney Rebecca L. Johnson in February of 2001, some three years ago in the Plaintiff's 26(a) disclosures. Attached to this motion is an affidavit submitted by Ms. Johnson indicating conversation between herself and defense counsel regarding the nature of the submissions to the effect that the defendants were well aware of the existence of the 4000 pages and the specific content of the discovery. A copy of the 26(a) disclosure should reveal that the documents were painstakingly categorized and labeled in 58 smaller headings.

Additionally, an affidavit is submitted by the Plaintiff indicating in more particularized detail how she came to remove the so-called stolen documents contained in her 26(a) disclosures from the Defendant's premises. It cannot be overemphasized that not all of the documents included in the Plaintiff's submissions even relate to the Defendant's claim that these documents were stolen or that the Plaintiff did not have lawful access to them.

The Plaintiff submitted 58 categories of documents which may be classified more generally as follows:

- Personnel records (hiring, orientation);
- Disciplinary (warnings, probation, termination, severance package);
- Training manuals and employee manuals;
- Plaintiff's personal work related diary;
- CHRO/EEOC proceedings;
- Photocopies reflecting Plaintiff's daily work related duties including emails;
- Photocopies reflecting the Plaintiff's coworker's daily work related duties;
- Evidence of Plaintiff's mitigation efforts;
- Plaintiff's Department of Labor (unemployment) submissions;
- Plaintiff's personal income related records

There is not one set of documents in the Plaintiff's possession that contain records she was not entitled to have. Many of the documents were produced directly by the Plaintiff or by third parties. Many more of the submissions consisted of records pertaining to her employment, orientation or training. The remainder of the documents concern her work related functions.

However, the Defendant has failed to produce any evidence concerning any specific personnel policies that contain any prohibitions on access to any of the documents listed in the Plaintiff's submissions. In addition, the Defendant's have failed to explain why it took three years for them to reach the conclusion that the Plaintiff was not in lawful possession of any of the records. Their delay in acting on their suspicions earlier than January of 2004 is unjustifiable.

Finally, if the Defendant's were allowed to amend their answer, it would open the proverbial "can of worms," necessitating a new and extensive discovery phase (documentary production) into the Defendant's questionable policies on access to company related records and past practices. It would also necessitate locating several potential witnesses who are no longer employed by the Defendant for the purpose of deposing them. Such a decision would certainly prejudice the Plaintiff inasmuch as the location of these witnesses and access to them may not be easily or even possibly obtained at this late stage.

For these reasons, the Plaintiff requests that the Court deny the Defendant's motion.

The Plaintiff,
Lila Davis

By: _____
Max F. Brunswick, Esquire
Attorney for the Plaintiff
12 Trumbull Street
New Haven, CT 06511
203/562-4024 (o)
203/782-5979 (f)

ORAL ARGUMENT NOT REQUESTED
TESTIMONY NOT REQUIRED

AFFIDAVIT OF FORMER COUNSEL, Rebecca L. Johnson:

Personally appeared Rebecca L. Johnson, who being duly sworn, deposes and says:

1. I was employed by the plaintiff, Lila Davis, to represent her in the pending wrongful termination matter and my representation continued until September of 2002 at which time Attorney Max Brunswick resumed her legal representation.

2. I was responsible for preparing the discovery in excess of 4,000 pages that is the subject of this motion.

3. I discussed the specific content of the discovery with defense counsel, Attorney Christina Calise Feeny even before I submitted it to her in February of 2001, three years ago.

4. When I first discussed the amount of pages involved in preparing the plaintiff's 26(a) disclosures she expressed great surprise at the volume and I first explained to her that Ms. Roberts, the plaintiff's supervisor ordered the plaintiff to leave her job on her last day with thousands of pages in several boxes. I was clear and specific when I described this to Mrs. Calise Feeny.

5. Moreover, the 26(a) disclosures do not merely consist of documents issued by the defendant, but rather contain a mixture of the plaintiff's training orientation, disciplinary and personnel records, along with documents generated on a day to day basis in the course of carrying out her employment related responsibilities. The 26(a) disclosures also contain emails and documents pertaining to the underlying administrative complaint. Many if not most of the 4000+ pages are documents that the plaintiff herself generated for personal reasons or were directly given to her by the defendant.

6. Finally, in light of my conversations with Attorney Calise Feeny prior to the plaintiff's February submissions as well as what a simple review of the 26(a) disclosures will reasonably reveal, defense counsel's claim that they are only recently in possession of "after acquired evidence" is spurious and unreasonable.

7. Since at least February of 2001, the defendants have had notice of the contents of the plaintiff's 26(a) disclosures as well as the fact that most of the documents included in the response were not even generated by the defendant.

8. Since at least February of 2001, the defendants have had notice that the remainder of the 26(a) disclosures consisted of documents that the plaintiff was entitled to have in her possession and that she certainly did not steal any of the documents from the defendant's premises.

(Affidavit cont'd)

*Rebecca L. Johnson*
Rebecca L. Johnson

Subscribed and sworn to before me this ___23___ day of ___Feb___, 2004.

_____
Commissioner of the Superior Court

AFFIDAVIT OF PLAINTIFF, LILA R. DAVIS:

Personally appeared Lila Davis, who being duly sworn, deposes and says:

9. I was employed by the defendant, Pilot Pen of America from June of 1999 through June of 2000.
10. Among other things, the defendant manufactures, markets and sells a wide variety of writing instruments and related products.
11. From June of 1999 through August of 1999, I was employed as a full time temporary employee through McIntyre Associates of Shelton, Connecticut.
12. I was employed as a customer service representative (hereinafter referred to as "CSR").
13. My responsibilities included: (1) receiving orders for writing implements and other related products via telephone and in writing; (2) entering such orders into a computer database; (3) preparing packages; (4) answering incoming telephone or in person inquiries regarding the products sold, the status of outstanding orders; resolution of complaints; inventory issues and billing issues; (5) filing; and (6) covering for other CSR's who were absent.
14. As a result of my satisfactory work performance, the defendant offered full time permanent employment to me in August of 1999.
15. My first supervisor was Judy Dezenzio.
16. Part of her supervisory responsibilities over my work included instructing me how to perform my job more efficiently, and specifically how to become more proficient at entering orders into the computer system.
17. Almost immediately after she commenced working for the defendant as my supervisor she would provide me with computer generated reports showing me the number of orders I had completed for particular days sometimes two or three times per month.
18. I also discovered that other reports were generated on a daily showing the numbers of orders entered by each CSR on a daily basis.
19. On or about March 31, 2000, approximately 12 weeks before I was terminated, Patricia Roberts commenced employment with respondent, replacing my former supervisor, Judy Dezenzio.
20. She immediately began to scrutinize my work product, especially the number of telephone calls I made and the number of orders I entered into the computer on a daily basis.
21. She also scrutinized the time I came to work and left, the time I spent in the women's lavatory.
22. She notified me in April that my employment was in jeopardy.
23. As a result of her scrutiny I began to photocopy and keep records summarizing the total number of daily entries that the CSRs made on the computer as well as their telephone logs beginning in April on my desk at work. My purpose was to compare my work product (orders entered on the computer and telephone calls made) with that of my co-workers.

24. From June of 1999 when I first started working, I kept a *personal* diary of all work that I did each day, as well as the training I received. I also recorded any other significant work related occurrences in my personal diary. By the time I was terminated by the defendant, I had 214 pages in my diary.

25. From June of 1999 until the date of my termination, I also kept a copy of my telephone logs which consisted of nearly every telephone call I made on a daily basis on my desk at work. By the time I was terminated by the defendant, I had 240 pages of my telephone logs.

26. From April of 2000 until the date of my termination, I also kept a copy of my coworker's telephone logs which consisted of nearly every telephone call they made on a daily basis on my desk at work. By the time I was terminated by the defendant, I had 92 pages of such telephone logs.

27. From June of 1999 until the date of my termination, I also kept a copy of all paperwork involved in my daily assignments on my desk at work. By the time I was terminated by the defendant, I had 2273 pages of such records.

28. I also forwarded copies of my personnel/disciplinary records, training/orientation records, administrative complaints (and corresponding documents), and timesheets totaling several hundred pages as part of discovery production to the defendant's attorneys.

29. I never stole any document nor had access to any record that was not accessible to any other employee.

30. I was never made aware that my access to any of the records in my possession was a violation of any understood and/or published policy on the part of the defendant.

31. **Only after** persistent badgering of the defendant's attorney did I testify hesitantly and ambiguously at my deposition that the documents may have been considered to be stolen, I have corrected my deposition via submission of a jurat to correct my mistaken beliefs. I have attached the jurat for the court's review.

32. What in fact happened is that the day I was terminated, my supervisor, Ms. Patricia Roberts walked to my desk and ordered me to clean all items from my desk and remove them.

33. I simply boxed everything in and on my desk and removed them from the premises.

34. Not only did she stand there and order me to do this, but she stood and watched me and offered to help.

35. She also walked me to the door as I was carrying boxes of documents and other personal items from my desk.

36. I was terribly shocked and humiliated at being terminated.

37. I was so numb and embarrassed and did not have the energy or enough enthusiasm to make a conscious decision to sift through my desk and examine what I was taking and try to "steal" anything.

38. I was simply trying to follow her instructions by packing my things and then leave and go home.

39.   I did not steal from the defendant.

(Affidavit cont'd)

_____
Lila R. Davis


Subscribed and sworn to before me this __27__ day of __Feb_____, 2004.

_____
Commissioner of the Superior Court

# JURAT

I, LILA DAVIS, do hereby certify that I have read the foregoing transcript of my testimony, taken on January 22, 2004, and have signed it subject to the following changes:

| PAGE: | LINE: | CORRECTION: | REASON: |
|---|---|---|---|
| 77 | 6 | change "85 to 90" to "60 to 65" | I realized upon reviewing the transcript my answer was inaccurate; |
| 92 | 21 | addition to the answer as follows: Most of the order forms given to me were illegible although other coworkers like Herta and Sandy did not have the same problem; | I forgot to state this fact; |
| 116 | 5 | change "uh-huh" to "orders according to delivery date were on a 24 hour turn around; | I realized upon reviewing the transcript my answer was inaccurate; |
| 117 | 1 | change "okay" to "60-65%" | I realized upon reviewing the transcript my answer was inaccurate; |
| 126 | 5-22 | addition to the answer as follows: I submitted a suggestion memo to Judy Dezenzio who in turn gave it John Ferraro. The suggestion I made was to add a certain line to dcreen 1 and this suggestion was implemented entitling me to an award of $100.00 which was never given to ne. John even announced at a group meeting that my suggestion was to be implemented. I inquired about the money several times after Patty became my supervisor but I was never given the money; Also, Diane Saksa refused to use the excel based spread sheet to record her telephone calls. my fellow CSR's were ordered to begin using the spreadsheet to record telephone Calls because it was faster than writing them out by hand. I believe Judy even ordered me to sit with Diane twice (for a total of approximately 60-90 minutes) explaining to her how to use the spread | I realized upon reviewing the transcript that my answer was not complete; |

1

| | | | |
|---|---|---|---|
| | | sheet. Diane told me that she was uncomfortable using the spreadsheet and that that she would maintain handwritten telephone logs for as long as she could. To the best of my recollection, all of the CSR's were using the spreadsheets as early as October of 1999, but Diane did not use the spreadsheets ever except for a few days in April and May of 2000. As I said using the spreadsheets was much faster and the handwritten telephone logs would slow you down, but noone confronted Diane about this problem she had. Patty never addressed and/or harassed her or monitored her every day about the use of spreadsheets the way she addressed me overthe quantity of orders I entered into the computer system. | |
| 138 | 15 | add to the answer: "Patty said she wanted a fresh start which was fine with me but I still had concerns. I gave her the memo anyway because I wanted her to know what my concerns were; | I realized upon reviewing the transcript that my answer was not complete; |
| 144 | 8 | add to the answer: "but Patty also told 20-25 orders and John said 15-18 orders;" | I realized upon reviewing the transcript that my answer was not complete; |
| 146 | 25 | change answer to the following: "60-65 percent, 24 hour turn around according to the delivery date;" | I realized upon reviewing the transcript that my answer was not accurate; |
| 147 | 10-25 | change answer to the following: "just made up or pretextual" and erase any reference to Patty Roberts being "mistaken"; | I realized upon reviewing the transcript that my answer was not accurate; |
| 148 | 19 | add to the answer the following: "but at other times Patty stated my quota was from 20-25 orders." | I realized upon reviewing the transcript that my answer was not complete; |
| 149 | 19 | change "twenty" to "20-25" | I realized upon reviewing the transcript that my answer was not accurate/complete; |
| 153 | 19 | add to the answer the following: "nor was I ever told that I needed to have authority to make copies. There is no policy ever issued by Pilot that I was made aware of that told us as CSRs | I realized upon reviewing the transcript that my answer was not accurate/complete; |

2

| | | | |
|---|---|---|---|
| | | that we could not look at or photocopy the daily reports maintained by Wendy." | |
| 153/154 | 22/1 | change the answer for each of the lines as follows: "Patty Roberts told me to remove all items from my desk when I was fired on on June 29th. She even provided me with the boxes to pack everything that was on and in my desk. She also stood at my desk watching me and asking me if she could help me. After that she walked me to the door as I was carrying out the items. At the very end, she asked if I had taken everything. Because I was so shocked and humiliated at being terminated I was numb and embarrassed. I was so hurt that I did not have the energy as I stood packing the "items" in and on my desk to think about what exactly I was doing. Patty stood there in a hurried manner and I just wanted to pack the things on my desk and leave. There was no conscious decision to sift through my desk and examine what I was taking. I was simply trying to follow her instructions and leave so that I could go home and cry and find someone to talk to because I was so hurt and shocked that it had come to this." | I realized upon reviewing the transcript that my answer was not accurate; |
| 154 | 1/3/6 | change the answer on each of the lines as follows: "No." | I realized upon reviewing the transcript that my answer was not accurate; |
| 154 | 8/10 | change the answer for each of the lines as follows: "I was never told that I needed to have authority to make copies. There is no policy ever issued by Pilot that I was made aware of that told us as CSRs that we could not look at or photocopy the daily reports maintained by Wendy." | I realized upon reviewing the transcript that my answer was not accurate/complete; |
| 154 | 12 | change the answer as follows: "No it is not stealing." | I realized upon reviewing the transcript that my answer was not accurate; |
| 154 | 14 | change the answer as follows: "I did not steal anything." | I realized upon reviewing the transcript that my answer was not accurate; |
| 154 | 18-19 | change the answer as follows: | I realized upon reviewing |

3

|     |       |                                                                                   |                                                               |
|-----|-------|-----------------------------------------------------------------------------------|---------------------------------------------------------------|
|     |       | "I did not steal any documents."                                                  | the transcript that my answer was not accurate;               |
| 156 | 3     | add to the answer as follows: "and the documents were not stolen."                | I realized upon reviewing the transcript that my answer was not accurate; |
| 159 | 13-16 | add to the answer as follows: "and the documents were not stolen."                | I realized upon reviewing the transcript that my answer was not accurate; |
| 159 | 19    | change the answer as follows: "Of the 4100 documents submitted as 26(a) disclosures none of them were stolen, nor were all of them Pilot generated documents; in fact I have turned over 58 categories of documents to my first attorney, Rebecca Johnson and I updated some of my submissions when Mr. Max Brunswick took over representing me. The 58 categories are as listed below. The categories that are underlined are documents either I personally or third parties generated *outside of any job related requirement*. The categories that are bolded are documents that were given to me by the defendant to keep as part of my personnel related records or else were given to me for training-orientation purposes. The remaining documents listed in categories 22-25 were emails that I had direct access to. The documents listed in categories 28 and 31-43 were records of the work that was specifically assigned to me while I was employed by the defendant. The documents listed in categories 29, 47, 52, 53 and 58 were documents that any body could have had access to as long as they knew of their existence (which I believe everyone did). These records were maintained by Wendy Jennings, a clerical employee. They were not kept under lock and key and there was never any policy that was written by the defendant to say that we could not have access to these records.: | I realized upon reviewing the transcript that my answer was not accurate; |

1. **Pilot Corporation of America Employee Handbook; 26 pages**
2. CCHRO/EEOC complaint and attachments; 61 pages
3. EEOC Notice of Right to Sue; 2 pages

4

4. <u>Plaintiff's resume</u>; 1 page
5. Memo re: security card dated 6/17/99; 2 pages
6. Memo re: gate security card reader dated 5/29/97; 1 page
7. Defendant's offer of employment letter to Plaintiff dated 8/4/99; 1 page
8. Defendant's benefit fact sheet; 2 pages
9. Note to Lila Davis File dated 8/5/99 and 8/6/99; 3 pages
10. Plaintiff's Employee Status 90 day, with Plaintiff's handwritten response; 3 pages
11. Probation review dated 6/29/00; 1 page
12. Severance Agreement package dated 6/29/00; 28 pages
13. Plaintiff's written warning-work performance dated 5/1/00, 1 page
14. Plaintiff's response to written warning (with attachments) dated 5/1/00; 42 pages
15. Plan of Action dated 6/1/00; 3 pages
16. Customer Service Representative job description dated 2/2/99; 1 page
17. Customer Service Representative job description dated 11/2/99; 2 pages
18. <u>Plaintiff's handwritten notes of 4/1/00 meeting with Patricia Roberts and Chante Bynes (with attachments); 6 pages</u>
19. <u>Plaintiff's handwritten notes dated 5/11/00; 1 page, (this document is lost and if and when we locate it, we will forward it to your office)</u>
20. Departmental Phone Listing; 2 pages
21. <u>Plaintiff's handwritten work diary from June 1999 – June 2000; 214 pages</u>
22. Email confirmation reports; 9 pages
23. Interoffice memos to or from Plaintiff; 151 pages
24. Email transmittals re: MIS problems; 13 pages
25. Memos to Customer Service Department; 43 pages
26. <u>Customers' written commendations to Plaintiff; 22 pages</u>
27. <u>Plaintiff's improvement/suggestion memos; 6 pages</u>
28. Plaintiff's computer generated telephone logs; 240 pages
    a. July, 1999; 25 pages
    b. August, 1999; 22 pages
    c. September; 1999; 18 pages
    d. October, 1999; 20 pages
    e. November, 1999; 20 pages
    f. December, 1999; 17 pages
    g. January, 2000; 21 pages
    h. February, 2000; 20 pages
    i. March, 2000; 20 pages
    j. April, 2000; 12 pages

5

    k. May, 2000; 35 pages
    l. June, 2000; 28 pages
29. Computer generated telephone logs for Plaintiff's co-workers; 92 pages
    a. Sandy Landro; 11 pages
    b. Joyce Carr; 6 pages
    c. Herta Page; 23 pages
    d. Donna McCausland; 10 pages
    e. Diane Saksa; 42 pages
30. Overtime batch letter labels; 10 pages
31. Plaintiff's daily work June 1999 [reflected through telephone inquiry forms, order inquiry forms, order forms, return authorization forms, invoice inquiry forms, shipping order forms, purchase order forms, invoice/credit memos, invoice/debit memos, rapid load purchase order forms, print key output forms, EDI invoices, UPS tracking summary forms, bills of lading, expedite request forms, fed ex airbill receipts, item inventory requirement by requested ship date forms, open stock forms]; 18 pages
32. July, 1999; 81 pages
33. August, 1999; 237 pages
34. September, 1999; 78 pages
35. October, 1999; 118 pages
36. November, 1999; 186 pages
37. December, 1999; 151 pages
38. January, 2000; 255 pages
39. February, 2000; 115 pages
40. March, 2000; 86 pages
41. April, 2000, 139 pages
42. May, 2000; 508 pages
43. June, 2000; (attached hereto) 301 pages
**44. Pilot Training Program Manual; 200 pages**
**45. Supplemental Program Manual; 124 pages**
46. Plaintiff's handwritten telephone logs (before Defendant required computer generated telephone logs); 189 pages
47. Herta Pages' deleted orders; 16 pages
**48. Pilot telephone bill; 4 pages**
**49. Plaintiff's Dept of Labor claim documentation; 24 pages**
50. Orders on hold; 6 pages
**51. Plaintiff's timesheets, August, 1999 through June 2000; 27 pages**
52. Diane Saksa's international accounts assignments; 33 pages
53. Sandy Landro's EDI accounts assignments; 29 pages
**54. blank forms; 13 pages**
**55. commercial products list; 13 pages**

|     |       |                                                                                                                       |                                    |
|-----|-------|-----------------------------------------------------------------------------------------------------------------------|------------------------------------|
|     | 56.   | <u>Plaintiff's mitigation efforts after termination from Defendant corporation; 151 pages (21 new pages with this mailing)</u> |                                    |
|     | 57.   | <u>Plaintiff's income tax returns for 2000-2002; 24 pages</u>                                                         |                                    |
|     | 58.   | Order File Summary reports; 21 pages                                                                                  |                                    |
| 243 | 19-20 | add to the answer as follows:                                                                                         | I realized upon reviewing the transcript that my answer was not complete; |

"I also believe that Patty evaluated my work more harshly because of my race. Even though Sandy and Herta were all CSRs and performed similar functions the way we did our work was very different. Because we performed our work differently, it allowed for the work reports to reflect deceivingly higher numbers of orders entered by Sandy and Herta to the undiscerning eye.

What I mean is that when Sandy and Herta entered orders on the computer, unlike me, for most of their orders the data that was normally supposed to be keyed in as part of entering the order on the system was automatically computer generated which meant they had fewer items of information to key in. This made it possible for them to key in hundreds or even thousands more lines of information as compared to the number of orders I keyed in on a daily basis. Unlike Sandy and Herta, no part of any of my orders were computer generated and therefore I had to key all of the data for every line order I typed in.

Each line had at least five categories of information to key in to complete the order. For me, I had to fill in all five or so categories to complete each order, whereas Sandy and Herta had most of the categories automatically done for them prior to being handed the order. They would simply hit the "enter" button once or twice to release the order (which meant the order was complete). Meanwhile I would be typing more detailed information for each of the five or so categories, for each order. This required hundreds of more strokes on my part on a daily basis as compared to these same co-workers. What makes this even more discriminatory is that Patty Roberts took the opportunity to distribute work and she

7

made sure that my coworkers, Herta and Sandy were given the accounts where they had more legible orders and the information necessary to complete the orders was for the most part computer generated, thereby saving them hundreds and thousands of computer key strokes on a daily basis. This artificially inflated their numbers. Even though Patty was aware of this she still harassed me every day about my so-called lack of productivity even though she was well aware of the fact that my orders required hundreds of more daily key strokes than Herta's and Sandy's and that I had to have more time than they did for each line of information typed in. Also, Herta Page was transferred to another department just days before I was terminated. She was behind in her orders and instead of having to deal with her tremendous backlog, she deleted the orders from the system altogether. My experience is that when even one order is deleted a "red flag" is sent up and a supervisor will come and question why an order has been deleted (because it probably means that money is lost when orders are deleted). However when Herta deleted nearly 16 or more orders in one day (which is tremendous) she was never even questioned. One of my coworkers who was aware of the harassment I was being subjected to by Patty anonymously dropped a pile of documents showing what orders Herta had deleted from the system without any management permission to cover up her backlog. However she was never questioned about it.

8

## CERTIFICATION

This is to certify that on this date a copy of the foregoing PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS' ANSWER AND AFFIRMATIVE DEFENSES has been hand delivered/forwarded via first class U.S. mail, postage prepaid to the following counsel and/or pro se parties of record:

Jackson, Lewis, Schnitzler & Krupman
177 Broad Street
P.O. Box 251
Stamford, CT  06904-0251

_____
Max F. Brunswick, Esquire