UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LILA DAVIS, | CIVIL ACTION NO. 301CV2204(DJS) |
| Plaintiff, | |
| v. | |
| PILOT CORPORATION OF AMERICA, | February 26, 2004 |
| Defendant. | |

### DEFENDANT'S REPLY TO PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS ANSWER AND AFFIRMATIVE DEFENSES AND MOTION TO STRIKE THE AFFIDAVIT OF REBECCA L. JOHNSON, PLAINTIFF'S AFFIDAVIT, AND PLAINTIFF'S "JURAT" DOCUMENT

Defendant Pilot Corporation of America ("Defendant" or "Pilot") hereby submits this Reply in response to Plaintiff's Objection to Defendant's Motion for Leave to Amend Its Answer and Affirmative Defenses filed February 24, 2004. Defendant further moves the Court to strike the Affidavit of Plaintiff's former counsel purporting to set forth legal arguments, to strike Plaintiff's Affidavit and the document titled "Jurat" and signed by Plaintiff, all attached to Plaintiff's Objection, and offered to alter Plaintiff's sworn testimony on the record in this case.

I. DEFENDANT'S MOTION FOR LEAVE TO AMEND SHOULD BE GRANTED

   A. Defendant's Motion For Leave To Amend Should Be Granted Because Plaintiff's Objection Is Untimely

Defendant filed its Motion for Leave to Amend Its Answer and Affirmative Defenses on January 30, 2004. Pursuant to the Local Rules "all memorandum in opposition . . . shall be filed without twenty-one (21) days of the filing of the [such]

motion." L. Civ. R. 7(a)1 (2004). Throughout this case,[1] Plaintiff's counsel has consistently violated the Rules and Orders of this Court. True to this practice, counsel for Plaintiff continues to show little, if any, respect for the applicable rules and that 21-day period for opposition passed on February 20, 2004 without any opposition being filed. It appears from the face of the Objection that counsel for Plaintiff prepared his Objection on the last possible day for filing and made no effort to ensure that it actually was filed that same day, as required by the Rules. Additionally, Plaintiff's Objection filed February 24, 2004 fails to offer any explanation or excuse for the failure to adhere to the Local Rules.

The applicable rule quoted above continues: "Failure to submit a memorandum in opposition to a motion may be deemed sufficient cause to grant the motion." L. Civ. R.

---

[1] Reviewing the record in this case one is hard-pressed to an ordered deadline that Plaintiff has honored. For example: in its March 13, 2003 Order in this case, the Court instructed that Plaintiff was required to respond to Defendant's June 10, 2002 discovery requests no later than April 11, 2003. In contravention of the Court's Order, as of April 30, 2003 Plaintiff persisted in her failure to respond to the 2002 discovery requests. (Docs. #32, 33.) On June 10, 2003, more than three months after appearing in this case, Plaintiff's substitute counsel filed a motion seeking yet another extension of time and purported to excuse his violation of the Court's Order based on the suspended attorney's failure to deliver "discovery material" to him. (See Plaintiff's Opposition to Defendant's Motion to Dismiss of the same date also blaming suspended original counsel for the delay. Doc. # 37.)

On August 27, 2003, counsel for Defendant attended an ordered Status Conference with the Court to discuss the pending motion to dismiss and motion for another extension of the discovery period. Counsel for Plaintiff did not appear and did not give any advance notice to Counsel for Defendant or, to Counsel's knowledge, to the Court.

Following this conference, on August 29, 2003, the Court ordered: Plaintiff to respond to the outstanding 2002 discovery requests by September 22, 2003; Plaintiff to take the one deposition she intended to take by October 31, 2003; and Defendant to complete their depositions by November 28, 2003. Counsel for Plaintiff would not agree to produce his client for the date noticed for her deposition of for any available full day thereafter before the scheduled end of the discovery period.

7(a)1. Thus, Defendant's Motion should be granted because Plaintiff failed to file any opposition within the time permitted by the Rules.

Alternatively, even the Court does not grant Defendant's Motion outright due to Plaintiff's failure to timely file opposition, the Court should not consider Plaintiff's untimely Objection and rule on the merit of Defendant's Motion as if it were unopposed.

### B. There Is No Need To Rule On The Merits Defendant's Motion For Leave To Amend Or Plaintiff's Opposition Thereto If The Court Adopts The Ruling Of *EEOC v. Morgan Stanley*

As noted in Defendant's principle Motion, the Courts of this Circuit have not consistently held the "after-acquired evidence" defense under the authority of McKennon v. Nashville Banner Publishing Co., 513 U.S. 352 (1995), to be an affirmative defense that should be included in Defendant's answer. The District Court in EEOC v. Morgan Stanley & Co., Inc., explained that "the Court in McKennon did not indicate whether after-acquired evidence must be pled as an affirmative defense, and the courts in this circuit have not directly considered the issue [2]." 2002 U.S. Dist. LEXIS 23727, *2 (S.D.N.Y. Dec. 11, 2002). In that same case, the District Court relied on the McKennon defense's uncertain status as support for its decision that a defendant need not amend its complaint to be able to later assert such defense at trial. Id.

If this Court adopts the ruling of EEOC v. Morgan, *supra*, then it need not address the merits of Defendant's Motion or of Plaintiff's untimely Objection, because that rule obviates the need to amend Defendant's Answer and Affirmative Defenses to include a McKennon defense.

---

[2] Other District Courts in the Second Circuit have permitted such amendment pursuant to Rule 15. Christian v. R. Wood Motors, Inc., 1995 U.S. Dist. LEXIS 5560, *37 (N.D.N.Y. Apr. 21, 1995) (granting defendants' motion to "amend their answer to add an affirmative defense of after-acquired evidence as to all plaintiff's claims").

### C. Even Considering Plaintiff's Objection The Pleadings Do Not Supply Sufficient Grounds To Deny Defendant's Motion

Plaintiff's Objection substantially misrepresents the content of Defendant's Motion for Leave to Amend and fails to provide any reasonable basis for denying the requested Amendment. In particular, nowhere does Defendant deny that it was aware of the existence or content of the more than 4000 pages eventually produced in various levels of organization by Plaintiff during discovery in this case. Plaintiff's Objection fails to understand or account for the key point that Defendant's had no first-hand knowledge or other admissible evidence concerning <u>how</u> <u>Plaintiff</u> <u>came</u> <u>to</u> <u>possess</u> those documents.

The only person with such knowledge was Plaintiff herself. The delay in obtaining that information from her of which Plaintiff's Objection complains stems primarily from the inability of Plaintiff's counsel to produce his client for deposition for prior scheduled depositions. At that deposition, finally held on January 22, 2004, Plaintiff plainly testified that she came to possess those documents by "stealing" them. (Excerpt of transcript of Plaintiff's 1/22/04 Deposition attached at Tab A.) It is this admissible evidence that <u>first</u> gave rise to Defendant's good faith basis for pleading a <u>McKennon</u> defense.

Additionally, as discussed in Defendant's principle memorandum (at page 4) the requested amendment would not require significant additional discovery because: Plaintiff is already in possession of Pilot's workplace policies; she has already had ample opportunity to explain how she came to possess those documents and whether such possession was authorized; and the fact that issues concerning the motives for termination

of Plaintiff's employment and whether there is any evidence that Defendant would not have taken such action but for Plaintiff's race or color.

## II. PLAINTIFF'S ATTACHMENTS TO HER OBJECTION TO DEFENDANT'S MOTION FOR LEAVE TO AMEND SHOULD BE STRICKEN

### A. The Affidavit Of Plaintiff's Counsel Should Not Be Admitted To The Record For Any Purpose

Plaintiff attaches the affidavit of her former counsel, Rebecca Johnson, against whom the Court entered an order of indefinite disciplinary suspension long before discovery was completed in this case, as support for her Objection. (Docket Doc. #25.) Despite this suspension, Plaintiff's current counsel proffers Ms. Johnson's affidavit to make his argument, factual and legal, for him. Ms. Johnson's putative sworn statement includes her legal judgments as to the reasonableness of Defendant's Motion for Leave to Amend, the proposed underlying affirmative defense, and even Defendant's motives. (Johnson Aff. ¶6.) Ms. Johnson's affidavit further attempts to rewrite the facts concerning the documents at issue as sworn to by Plaintiff at her deposition, as if Ms. Johnson herself has first-hand knowledge of such facts. (See e.g., Johnson Aff. ¶4, 8.)

Counsel and Ms. Johnson's attempt to make an end-run around Ms. Johnson's continued suspension from the practice of law in this Court by allowing Ms. Johnson to craft the legal argument in this case, or at least for purposes of this Motion, should not be permitted. This questionable practice should not be rewarded by permitting the affidavit to become part of the official record in this case.

B.  **Plaintiff's Affidavit And "Jurat" Document Do Not Comply With The Federal And Should Be Admitted To The Record For Any Purpose**

In support of her Objection to Defendant's Motion for Leave to Amend, Plaintiff attaches her own affidavit and a document titled "Jurat." These documents present as admissible evidence information that squarely contradicts or otherwise substantially alters Plaintiff's sworn deposition testimony. (See Plaintiff Aff. ¶23, 29, 31, 37, 39; Jurat at 2-3. Compare Plaintiff's Deposition at 150-54, attached.) Plaintiff also purports to state much, if not all, of her discrimination case in these attachments, including statements and putative "corrections" to her affidavit on a host of topics irrelevant to the instant Motion.

The Federal Rules of Civil Procedure and the applicable law do not permit such attempts by Plaintiff, her counsel, or in this case her former counsel to rewrite Plaintiff's deposition testimony after-the-fact for any purpose. To the contrary, one of the Courts of Appeals admonished counsel for similar reliance on his client's own "errata" form "stray[ing] substantively from the [client's own] original testimony" and explained the plain purpose of Federal Rule of Civil Procedure 30(e):

> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. **A deposition is not a take home examination**.

Garcia v. Pueblo Country Club, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002) (quoting Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992)) (emphasis added).

The Second Circuit has repeatedly refused to give weight to a party's affidavit created to re-craft and contradict that same party's own deposition testimony. Cf. Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit . . . that . . . contradicts her own prior deposition testimony"); Bickerstaff v. Vassar College, 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that ... contradicts the affiant's previous deposition testimony"); Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not . . . create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony.")

The attachments to Plaintiff's Objection squarely run afoul of these rules and should not be admitted to the record for purposes of considering Defendant's Motion for Leave to Amend. Indeed, in view of these same rules and authority, there can be no proper purpose for those attachments and they should not be admitted to the record for *any* present or future purpose in this case.

WHEREFORE, Defendant respectfully requests that this Court grant it leave to amend its Answer to include the additional affirmative defense that Plaintiff engaged in wrongdoing during her employment that was of such severity that Plaintiff in fact would have been terminated had Pilot had known of the evidence of that wrongdoing at the time of the discharge. Defendant further moves this Court to strike all of the attachments to Plaintiff's Objection from the record and not to admit them for any purpose in this case.

Respectfully Submitted,

PILOT CORPORATION OF AMERICA

By: _____
Michael J. Soltis
CT 07413
Alison Jacobs Wice
CT21771
JACKSON LEWIS LLP
177 Broad Street
P.O. Box 251
Stamford, Connecticut 06904
Tel. (203) 961-0404
Fax. (203) 324-0704
E-mail: soltism@jacksonlewis.com
              wicea@jacksonlewis.com

CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing REPLY AND MOTION TO STRIKE has been sent via facsimile transmission and first class mail, postage prepaid, to the following:

> Max F. Brunswick, Esq.
> 12 Trumbull Street
> New Haven, Connecticut 06511
> Fax. (203) 782-5979

This 26th day of February 2004.

_____
Alison Jacobs Wice

Case 3:01-cv-02204-DJS   Document 59   Filed 02/27/2004   Page 10 of 19

1   Q   How do you know that?

2   A   There were times we just talked among each
3 other.

4   Q   All right.

5   A   There were times that we got a -- we had a
6 meeting on a particular time.  There was like a report
7 generated so we knew, we could see what each other did.

8   Q   Okay.  Any other way you knew what other CSRs
9 were doing?

10  A   Not that I can remember.

11  Q   Okay.  So these reports -- these reports
12 reported on the orders that each CSR did?

13  A   Correct.

14  Q   And who ran these reports?

15  A   I don't know who ran them.

16  Q   Were these Patty's reports?

17  A   I don't know whose reports they were or who they
18 got delivered to.

19  Q   Who gave them to you?

20  A   Who gave them to me?

21  Q   Yes.

22  A   No one gave them to me.

23  Q   How did you get access to them?

24  A   They were in Wendy's cubicle, and when I went to
25 put my telephone log away I pulled out a book and that's

1  how I saw the report.
2  Q    So you put in your telephone log?
3  A    No. I went to take the book out and the log was
4  -- you know, I pulled out the wrong book.
5  Q    Okay. And you looked at them and you saw
6  reports for all CSRs?
7  A    Correct.
8  Q    At that point you realized that everybody's
9  orders were being tracked?
10 A    Right.
11 Q    It wasn't just yours?
12 A    Correct.
13 Q    It wasn't just a race based tracking, it was
14 every CSR was tracked?
15 A    The tracking was not race based.
16 Q    As far as the scrutiny from the tracking of
17 orders, that effected all CSRs?
18 A    Correct.
19 Q    Caucasian and African-American?
20 A    Correct.
21 Q    That had nothing to do with race?
22 A    That the tracking from Pilot had nothing to do
23 with the race.
24 Q    And did you have occasion to review the orders
25 for all the other -- the order tracking for all the other

```
 1  CSRs?
 2       A    Did I have an occasion to review them?
 3       Q    Yes.
 4       A    I'm not sure if I understand.
 5       Q    You pulled out the binder, you looked at it,
 6  right?
 7       A    Correct.
 8       Q    Did you make copies of the documents?
 9       A    Yes, I did.
10       Q    And who did you ask for permission to make
11  copies of those documents?
12       A    Permission wasn't needed.  I checked with Sandy
13  the head -- the senior rep and she said that was for
14  anyone to look at.
15       Q    Who authorized you to make copies of those
16  documents?
17       A    Who authorized me?
18       Q    Correct.
19       A    No one authorized me.
20       Q    Who authorized you to remove those documents
21  from Pilot's premisses?
22       A    No one.
23       Q    So you stole the documents?
24       A    I was -- no, I didn't steel them.
25       Q    Who authorized you to remove them?
```

1  A   No one.
2  Q   They are Pilot's documents; you agree with that?
3  A   Yes.
4  Q   So you took Pilot's documents without
5  authorization from Pilot's premises; is that correct?
6  A   Correct.
7  Q   No one authorized you to do it, right?
8  A   Correct.
9  Q   You never saw an authorization to do it?
10 A   Correct.
11 Q   And that's not stealing?
12 A   It is stealing.
13 Q   When did you steal those documents?
14 A   The date and time I can't tell you.
15 Q   And what did you do with the stolen documents?
16 A   What did I do with them?
17 Q   Yes.
18 A   I actually didn't remove them from Pilot for a
19 while. They stayed at my desk.
20 Q   When did you remove them from Pilot?
21 A   The day I was let go.
22 Q   That's when you removed them?
23 A   Correct.
24 Q   Have you reviewed them since you removed them
25 from Pilot?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And what CSRs were processing less orders than |
| 3 | you? | |
| 4 | A | Less? |
| 5 | Q | Less. |
| 6 | A | There were days that Herta processed less, |
| 7 | Joyce. I want to say Diane but I would need to see the |
| 8 | document to say Diane. |
| 9 | Q | There were days when Joyce -- Joyce Carre? |
| 10 | A | Right. |
| 11 | Q | Is that the one -- how long was she there after |
| 12 | Patty Roberts came? |
| 13 | A | Maybe two weeks. |
| 14 | Q | She's the one who left because she didn't like |
| 15 | Patty Roberts? |
| 16 | A | I don't know why she left. I don't know. |
| 17 | Q | We talked about her before? |
| 18 | A | Right. |
| 19 | Q | And who else had less? |
| 20 | A | Herta Page. |
| 21 | Q | On some days? |
| 22 | A | Correct. |
| 23 | Q | And did you do an average over a week or a |
| 24 | month? |
| 25 | A | Did I do an average? |

```
 1      Q    Yes.
 2      A    No.
 3      Q    When you analyzed these stolen documents, did
 4 you look at them just by day or did you look at them by
 5 the average over a week?
 6      A    I would say both.
 7      Q    Okay.  And who had a lower average per week than
 8 you?
 9      A    Who had an average -- lower average than me?  It
10 depended -- depends on the day.
11      Q    No.  We're talking about a week.  Who had a
12 lower -- let me withdraw that.
13           You told us you analyzed these documents by
14 looking at the average per week?
15      A    Uh-huh.
16      Q    My question is:  When you analyzed the documents
17 that way, did you find that any CSR had a lower average
18 per week than you?
19      A    There were times, yes.
20      Q    Okay.  Who and when?
21      A    I would say -- the date I can't tell you off the
22 top of my head.  There were times that Herta and I want to
23 say Diane did.
24      Q    Okay.  Would you agree that you had the lowest
25 average per week on many of those weeks?  Many of the
```

1 weeks that Patty was employed?

2    A    No.

3    Q    You would not agree with that?

4    A    No.

5    Q    Would you agree that on some weeks that Patty
6 was employed in those three months, April, May, June, you
7 had the lowest average per week for orders?

8    A    No.

9    Q    So it's your view that there's not a single week
10 during those three months where you processed the least
11 number of orders compared to other CSRs?

12    A    The processing is more than just the data entry.
13 There were times that I prepped the orders and Patty would
14 take my orders leaving me with other orders that I had
15 processed, so therefore what I entered was less which she
16 took and entered under her name, so no.

17    Q    Are you suggesting that those orders sheets are
18 not -- don't accurately indicate what the number of orders
19 the CSRs processed?

20    A    No, I'm not.

21    Q    So they are accurate?

22    A    They are accurate.

23    Q    It's your testimony that there's not a single
24 week during April, May or June of 2000 when you had the
25 lowest average number of orders of the CSRs. That's your

1 testimony?

2    A    Yes, perhaps the week I was not feeling well.

3    Q    I'm not sure you and I are communicating well.
4 Are you saying there were some weeks when you had the
5 lowest average per week of the CSRs?

6    A    I'm saying the week that I was not feeling well,
7 perhaps that week is the week that my average might have
8 been low in Patty's eyes.

9    Q    What week was that?

10    A    The week that we discussed earlier. I don't
11 know.

12    Q    That was in April.

13    A    Right.

14    Q    Okay. Let me ask you, Ms. Davis, to look at the
15 last page of that exhibit. Have you seen that document
16 before?

17    A    The email?

18    Q    Yes.

19    A    Yes, I believe I have.

20    Q    Okay. Is it a correct statement that in that --
21 in the meeting on May 1 Ms. Roberts told you that you had
22 thirty days to improve your production rate; is that a
23 correct statement?

24    A    I believe she did tell me that.

25    Q    Is it a correct statement that Ms. Roberts told

1  you that she would help you any way she could to help you
2  meet these goals?
3      A   I believe she did tell me that.
4      Q   Is it a correct statement that Ms. Roberts made
5  it clear that if you did not meet these goals it would
6  lead to further discipline up to and including
7  termination?
8      A   I'm not sure she told me that.
9      Q   Do you recall any discussion about what might
10 occur if you did not meet the goals?
11     A   No.
12     Q   What other documents did you steal from Pilot?
13     A   There were forms. Copies of -- I took
14 everything out of my desk as far as anything that I had.
15 Every order, anything that I did as far as forms.
16 Whatever was in my desk.
17     Q   You've provided 4100 documents in this case, and
18 are those all documents you stole from Pilot?
19     A   Those were the documents that were in my desk.
20     Q   That you removed from Pilot without
21 authorization?
22     A   I removed from Pilot.
23     Q   Those are not by any chance the documents that
24 you want Pilot to pay for copies of, is it?
25     A   Yes, it is.