UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LILA DAVIS,<br><br>          Plaintiff,<br><br>v.<br><br>PILOT CORPORATION OF AMERICA,<br><br>          Defendant. | CIVIL ACTION NO.<br>301CV2204(DJS)<br><br><br><br><br>February 27, 2004 |

## LOCAL RULE 56(A)(1) STATEMENT

Pursuant to Local Rule 56(a)(1), Defendant Pilot Corporation of America ("Pilot" or "Defendant") the following are the undisputed facts in the above-captioned case for purposes of Defendant's Motion for Summary Judgment as established by the depositions, affidavits and documents produced by the Parties. L. Civ. R. 56(a)(1) (2004).

**I.     PILOT'S BUSINESS AND PLAINTIFF'S EMPLOYMENT**

    **A.     Pilot's Customer Service Department**

    1.     Pilot is a multinational company, headquartered in Japan, that produces and distributes pens and related products. (Faulkner Aff. ¶4.[1]) Pilot has its administrative offices, which includes its Customer Service Department, in Trumbull, Connecticut. (Pl.Dep. 47.)

    2.     Since 1990, Customer Service Manager John Ferrara has been responsible for overseeing the daily activities of Pilot's Customer Service Department. (Ferrara Aff. ¶3.[2])

---

[1] The affidavit of Laurie K. Faulkner made in support of Pilot's Motion for Summary Judgment and exhibits thereto are enclosed. References to that affidavit are made herein as "(Faulkner Aff. ¶__.)"

     3.     Until March 2000, Judy DeZenzio was the Assistant Customer Service Manager (Pl.Dep. 75-76, 79-81.[3])

     4.     On April 3, 2000, Patty Roberts became the Assistant Customer Service Manager. (Pl.Dep. 80-81.)

     5.     Before coming to Pilot, Ms. Roberts worked at UPS for over six years as Supervisor of Dispatch. (Roberts Dep. 8.[4])

     6.     In that position, Ms. Roberts received extensive logistics training and then conducted time studies of customer service and the employees under her supervision to measure their work functions, determine staffing levels and monitor the volume of work output. (Roberts Dep. 16; Roberts Aff. ¶3[5].)

     7.     Ms. Roberts applied that time study methodology at her subsequent jobs, including Airborne Express, Manager of the TFS customer service call center, and at Pilot. (Roberts Aff. ¶4.)

     8.     As Assistant Manager, Ms. Roberts supervised Donna McCausland, Strategic Service Coordinator (Caucasian); Jeanette Hirsch, Secretary (Caucasian); Brenda Smorto,

---

[2] The affidavit of John Ferrara made in support of Pilot's Motion for Summary Judgment and attachments thereto are enclosed. References to that affidavit are made herein as "(Ferrara Aff. ¶__.)"

[3] Cited excerpts of testimony from Plaintiff's January 22, 2004 deposition are enclosed at "Tab A" to Defendant's Memorandum and references to that testimony are made herein as "(Pl.Dep. __.)"

[4] Cited excerpts of testimony from Ms. Roberts' January 15, 2004 deposition are enclosed at "Tab B" to Defendant's Memorandum and references to that testimony are made herein as "(Roberts Dep. __.)"

[5] The affidavit of Patricia Roberts made in support of Pilot's Motion for Summary Judgment and attachments thereto are enclosed. References to that affidavit are made herein as "(Roberts Aff. ¶__.)"

Customer Service Correspondent (Caucasian); Brenda Keller, Customer Service Clerk (Caucasian); Wendy Jennings, Customer Service Clerk (African-American); Sandra Landro, Senior Customer Service Representative (Caucasian); CSR Lila Davis (Plaintiff, African-American); CSR Diane Saksa (Caucasian); CSR Herta Page (Caucasian); and CSR Joyce Carre (Caucasian), who left the Department shortly after Ms. Roberts joined Pilot. (Pl.Dep. 88; Roberts Dep. 30-32; Faulkner Aff. ¶5.)

9. Pilot employed these Customer Service employees in various roles such as: secretarial, clerical, customer service and senior customer service with consumers, stores and Pilot's internal sales representatives. (Roberts Dep. 28, 31.)

10. The Customer Service Department deals with all aspects of customer service. The daily responsibilities of the CSRs included: processing purchase orders and merchandise returns by entering data into a computerized database, entering information from order/credit forms faxed to the Department into a computerized database; coordinating customer correspondence by preparing packages of pre-designated, pre-printed letters and sample products in response to consumer inquiries; communicating with customers and Pilot field sales personnel to coordinate special requests, orders, and resolve problems by answering telephone and other inquiries; and maintaining up-to-date pricing and promotional files. (Pl.Dep. 53, 55, 63; D.Exs. 2, 3.)

11. Plaintiff and Diane Saska were the two CSRs assigned primarily to do data entry and customer service calls. (Roberts Dep. 34-35.)

12. Senior CSRs, such as Ms. Landro, handled customer service for larger scale National Accounts. (Pl.Dep. 94.)

13. Customer Service Clerks Wendy Jennings and Brenda Keller were responsible for recordkeeping and processing Department correspondence. (Pl.Dep. 94, 97, 151.)

14. Ms. Keller maintained a log of orders coming into the Department and which of the CSRs received the order entry assignment for each order. (Roberts Aff. ¶6, Att. A.)

15. In June 1999, Pilot terminated the employment of Peggy Ann Kelley, a Caucasian woman, for poor performance. (Pl.Dep. 61-62; Faulkner Aff. ¶6, Att. A.)

16. Pilot had counseled Ms. Kelley that she was expected to enter an average of 21 to 22 orders daily. (Faulkner Aff., Att. A.) When Ms. Kelley failed to maintain that average, Pilot terminated her employment. (Id.)

**B.  Plaintiff's Employment**

17. Plaintiff was initially hired and assigned to Pilot through a temporary help agency to fill a temporary CSR position in June 1999. (Pl.Dep. 37-38, 61-62; Faulkner Aff. ¶8.)

18. At the outset, PCA excused Ms. Davis from answering customer telephone calls while she learned about the Company, its product lines and the order entry process. (Pl.Dep. 51-52, 69.) During this time, the Company expected Plaintiff to focus on order entry so that she could handle the multiple tasks required of all CSRs, in addition to that data entry function. (Id.)

19. On August 16, 1999, Mr. Ferrara and Ms. DeZenzio hired Plaintiff as a full-time regular CSR in its Customer Service Department. (Pl.Dep. 64.)

20. From the time that she started with Pilot, on her own impetus and as was her habit from prior employment, Plaintiff kept a "diary" tracking her daily tasks as a CSR. (Pl.Dep. 228-29; D.Ex.8/Tab D.[6])

---

[6] Copies of cited exhibits to Plaintiff's January 22, 2004 deposition are enclosed at "Tab C" to Defendant's Memorandum. except as provided otherwise for Exhibits 8 and 9. References to those exhibits are made herein as "(D.Ex. _.)" Exhibit 8 to Plaintiff's deposition is comprised of an excerpt (Davis0741-0800) of the "diary" Plaintiff kept during the time she worked at Pilot and that she produced in its entirety during discovery. A copy of a more complete excerpt (Davis0690-0847), including the pages constituting Exhibit 8, is included at "Tab D" to Defendant's Memorandum and referred to herein as "D.Ex.8/Tab D."

21. On November 17, 1999, Ms. DeZenzio prepared Davis' 90 day evaluation. (Pl.Dep. 65; D.Ex. 4.) This review noted that "Lila needs to develop a method to increase the speed of her order entry while maintaining her accuracy." (D.Ex. 4 (Davis3959).) Ms. DeZenzio also documented that Plaintiff did not participate enough in the efforts of the CSR group. (Id.)

22. Plaintiff responded to this evaluation, offering that she would arrange additional training with fellow CSR Herta Page to improve her data entry speed and that she would try to interact more within the CSR group. (D.Ex. 4 (Davis3959-3960).) Plaintiff also pledged that she would soon be handling her full duties and entering all of her orders within a 24-hour period as required. (Id.) Davis also asked that she be excused from responsibility for taking customer service telephone calls while she worked on order entry, as she was allowed to do when she was still new to the job. (Id.)

23. Around the same time as this evaluation, in November 1999 Plaintiff e-mailed her supervisor to report that even though she was "doing the best [she] can," she was having trouble keeping up with her order entry assignments and other CSR responsibilities. (Att. E to Defendant's Memorandum.)

24. At Mr. Ferrara's request, before Ms. DeZenzio departed Pilot, she prepared a document entitled "Current Customer Service Setup" in which she reviewed the responsibilities and performance of several of the customer service employees, including Plaintiff. (Ferrara Aff. ¶6, Att. A.) Concerning Plaintiff's performance, Ms. DeZenzio reported:

1. Lila is very cautious at Order Entry. Each mistake causes her to be even more cautious. This pace generally makes her behind a lot.

2. Her co-worker's chatting a lot distracts her. The distraction also causes her to go behind. I have coached her by telling her to focus on the task at hand. . . .

(Id.)

25. Patricia Roberts replaced Ms. DeZenzio on April 3, 2000, prepared and eager to apply her productivity and efficiency management background to the Customer Service Department and CSR functions. (Roberts Aff. ¶3, 4.)

26. On April 4, Ms. Roberts met individually with most of the CSR's, including Plaintiff, to learn their job functions and to begin the process of identifying ways to improve the Department. (Pl.Dep. 82-83, 232.)

27. Ms. Roberts first met with Customer Service Clerk Brenda Keller and reviewed her work distribution log which listed the work she distributed to the CSRs. (Roberts Aff. ¶6.) Ms. Roberts noticed that the entries for Plaintiff were often crossed out and redistributed to CSRs Diane Saksa, Herta Page and Joyce Carre. (Roberts Aff. ¶7.)

28. Ms. Roberts also met with CSRs Herta Page, Diane Saska, Joyce Carre and Plaintiff. (See Pl.Dep. 232.)

29. During her meeting with Plaintiff, Ms. Roberts was initially impressed with Plaintiff's ability to train her (Ms. Roberts) on the AS400 system and acquaint her with Plaintiff's job duties. (Pl.Dep. 82, 124.) Ms. Roberts told Plaintiff that she did a "great" job. (Id.)

30. To standardize order processing and make it more efficient, Ms. Roberts analyzed order processing records, by individual CSR, from the previous month, and then from the previous year. (Roberts Aff. ¶9, 10, Att. B; see also D.Ex.9/Tab F.[7])

---

[7] Defendant's Exhibit 9 at Plaintiff's deposition is comprised of an excerpt of the Order File Summary forms produced in this case. Copies of all of the Order File Summary forms for the period July 1999 through June 2000 and produced in this case are included at "Tab F" to Defendant's Memorandum. These pages are combined as a single exhibit and referred to herein as "D.Ex.9/Tab F."

31.     Ms. Roberts used these records, as well as the CSRs' telephone logs and order file summary sheets, to determine how many e-mails and calls a CSR should be able to respond to per day.  (Roberts Aff. ¶9.)  This review indicated that the CSRs should be able to: (a) enter an average of 20 orders daily; (b) respond to between 20 and 25 consumer letters; and (c) handle the volume of 5 to 15 telephone calls coming into the Department each day.  (Roberts Aff. 10, Att. B.)

32.     Ms. Roberts asked the CSRs to report to her daily the number of orders entered and telephone calls handled daily.  (Pl.Dep. 178.)

33.     Ms. Roberts required all of the CSRs to complete a daily report; Ms. Roberts tracked the daily order entry numbers on the Order File Summary form for each CSR.  (Pl.Dep. 152, 170; D.Ex.9/Tab F.)

34.     The "general understanding" for all of the CSRs while Ms. Roberts was the supervisor was the same as it had been under Ms. DeZenzio: 85 to 90% of the orders needed to be turned-around within 24 hours.  (Pl.Dep. 74-75, 204.)

35.     On or about April 5, Plaintiff informed Ms. Roberts that she regularly took her phone off the hook for 30 to 45 minutes per day, when needed, to focus on order entry.  (Pl.Dep. 84.)  Ms. Roberts allowed Plaintiff to continue this practice. (Id.)

36.     Ms. Roberts continued Ms. DeZenzio's practice of allowing all CSRs to take their telephones of the hook for 30 to 45 minutes so that they could concentrate on order entry.  (Pl.Dep. 69, 70, 76, 84.)

37.     On April 7, Plaintiff reported to Ms. Roberts that she was 1½ days behind in her order entry.  (D.Ex.8/Tab D (Davis0748).)  Ms. Roberts worked with Plaintiff on some of the

orders and Ms. Roberts excused Plaintiff from order entry while she (Plaintiff) processed consumer correspondence. (Id.)

38. The next workday, Monday April 10, 2000, Ms. Roberts met with Plaintiff to discuss her concerns about Plaintiff falling and remaining behind in her work, Plaintiff being distracted by talking with a co-worker, and not arriving on time. (Pl.Dep. 114, 118-121; Def.Ex.4.) That day, Ms. Roberts also counseled Plaintiff that she was not keying in orders quickly enough. (D.Ex.8/Tab D (Davis0748).)

39. Plaintiff requested a meeting with Human Resources regarding Ms. Roberts' April 10 comments about her performance. (Pl.Dep. 132; Def.Ex.4.)

40. In anticipation of this meeting, Plaintiff submitted a multiple page document to Personnel in which she claimed Ms. Roberts was singling her out. (Id.)

41. On or about April 11 Plaintiff met with Chantay Bynes of Pilot's Human Resources Department to discuss these issues. (Pl.Dep. 132-33.) Plaintiff found Ms. Bynes to be sincerely concerned about Plaintiff. (Pl.Dep. 133.)

42. Ms. Roberts joined this meeting and reiterated her offer to work with Plaintiff to help her in whatever way she could. (Pl.Dep. 135.) Ms. Roberts told Plaintiff that her intention was not to discipline Plaintiff, particularly if the production problems at issue were only because Plaintiff was not feeling well, as Plaintiff had suggested.. (Pl.Dep. 136-37.) Ms. Roberts also suggested that if Plaintiff were too ill to perform her duties then she should take a sick day. (Pl.Dep. 142; see also D.Ex.8/Tab D (Davis0748).)

43. At the same meeting, Ms. Roberts informed Plaintiff that she was expected to improve her order entry rate to an average of at least 18 orders per day. (Pl.Dep. 144.) Ms.

Roberts also offered to arrange for any training with a senior CSR that Plaintiff felt would be helpful. (Pl.Dep. 140, 142-43.)

44. Plaintiff agreed that she would inform Ms. Roberts daily if she had fallen behind in her work. (Pl.Dep. 143.)

45. Ms. Roberts did not write-up Plaintiff's performance problems at that time. (Pl.Dep. 137.)

46. Ms. Roberts arranged for additional date entry training for Plaintiff with the senior CSR. (Pl.Dep. 143-44.)

47. Following this meeting and as Plaintiff and Ms. Roberts had agreed, Plaintiff began e-mailing Ms. Roberts daily, often reporting in unnecessary and unprofessional detail the tasks she performed each day. (Roberts Aff. ¶11, Att. C.) These e-mails reflected Plaintiff's continued inability to keep up with her assigned workload. (Id.)

48. According to Plaintiff's e-mails, during April, she failed to enter more than 15 orders on all but three days, and entered 20 or more orders only once. (Roberts Aff. ¶12, Att. C; see also D.Ex.8/Tab (Davis0746-0759).)

49. By on or about April 25, Plaintiff was 18 orders behind; Ms. Roberts completed some of Plaintiff's orders. (Pl.Dep. 145; Roberts Aff. ¶13, Att. C.) Ms. Roberts again sat with Plaintiff to review her orders and explained to Plaintiff again that she needed to improve her order entry speed. (Roberts Aff. ¶14.)

50. Plaintiff responded to this instruction by pledging to "do [her] best." (Pl.Dep. 145.) Plaintiff attributed her low production numbers in early April not to Ms. Roberts' management style, but to not feeling well. (Pl.Dep. 141-42, 202-03; see also D.Ex.8/Tab D (Davis0747).)

51.     On May 1, 2000, Ms. Roberts issued Plaintiff a written warning to memorialize her continuing concerns about Plaintiff's performance. (Pl.Dep. 140; D.Ex. 5.) Ms. Roberts summarized that as of April 10, Plaintiff was already "two plus days behind schedule." (D.Ex. 5.) Additionally, for the first three weeks of April, Plaintiff continued to average less than 15 orders per day. (Pl.Dep. 157; see also D.Ex.8/Tab D (Davis0746-0759).) Ms. Roberts told Plaintiff that Pilot expected her to improve the rate of order entry and to process orders on time. (Pl.Dep. 145; D.Ex. 5.)

52.     Ms. Roberts told Plaintiff in the written warning:

> As a result of continued failure to meet any goals set for Lila after displaying she was capable of meeting these goals. I am placing you on written warning. I expect you to carefully consider your job responsibilities and immediately increase your production of order entry.

(D.Ex. 5.)

53.     Shortly after she received this written warning, Plaintiff wrote a rebuttal and asked that the warning be retracted. (Pl.Dep. 163; D.Ex. 5.)

54.     In response to Plaintiff's rebuttal, Ms. Roberts, Ms. Bynes met with Plaintiff again to discuss the warning and Plaintiff's response. (Pl. Dep. 163-64.) At this meeting, Plaintiff claimed that Ms. Roberts' interruptions were interfering with her ability to do her work. (Pl.Dep. 165.)

55.     Ms. Roberts explained to Plaintiff that effective immediately, Plaintiff could again be excused from answering CSR calls for the first hour and a half in the morning so that she could complete one "batch" of 20 consumer letters. (Pl.Dep. 165-66.) Plaintiff was also instructed that she had 30 days to improve her performance. (Pl.Dep. 166.)

56.     On May 8, 2000, Ms. Roberts and Ms. Bynes, as well as Mr. Ferrara, again met with Plaintiff to discuss her continued performance problems. (Pl.Dep. 174, 178.) Ms. Bynes

advised Plaintiff that if she were unhappy in her job, she should consider looking for a new position. (Pl.Dep. 176.)

57. Mr. Ferrara reminded Plaintiff that she was expected to complete the production report that all of the CSRs were required to do. (Pl.Dep. 178.)

58. Following this counseling, later that same day, Plaintiff e-mailed Ms. Roberts asking her to clarify Pilot's expectations for Plaintiff's performance. (Roberts Aff., Att. D.)

59. Ms. Roberts responded that Ms. Davis should complete a batch of 20 customer inquiries in an hour and a half and enter 20 orders (averaging 20 line items) per day. (Roberts Aff., Att. D.)

60. According to her own e-mails, on May 1 and 2, Plaintiff processed 10 or less orders. (Roberts Aff., Att. C (Pilot0113-0114).)

61. Plaintiff recorded in her diary that over the next three weeks (May 3 – May 23), she exceeded 15 orders only twice. (D.Ex.8/Tab D (Davis0763-0773).)

62. On May 24, Ms. Roberts advised Plaintiff that she was still failing to keep up with her assigned work and that she must improve her performance in the next two weeks or her employment would be terminated. (D.Ex.8/Tab D (Davis0773-0774).)

63. Ms. Roberts also asked Plaintiff if she had suggestions for any other steps Pilot could take to help her to improve. (D.Ex.8/Tab D (Davis0773-0774).)

64. The next day, May 25, Plaintiff recorded in her diary that she entered only 10 orders and was 39 orders behind. (D.Ex.8/Tab D (Davis0775).)

65. On June 1, the thirty-day period set for Plaintiff in conjunction with the May 1 warning expired. (D.Ex. 5.)

66. That day, Human Resources Director Laurie Faulkner and Ms. Roberts met with

Plaintiff to review Plaintiff's continued failure to meet performance expectations. (Pl. Dep. 184; D.Ex. 6.)

67. The group reviewed the steps Ms. Roberts had taken, many in response to Plaintiff's requests, to help Plaintiff increase the number of orders she entered per day. (Id.) These measures included getting Plaintiff a new calculator with a line-item printout option, "batching" groups of orders before keying them, instead starting and restarting the entire entry process with each separate order, and excusing her from answer telephone calls for at least part of the day. (Pl. Dep. 180-81, 184, 187-88, 200, 221; D.Ex. 6.)

68. Although Plaintiff had not met the goals set in the May 1 "Action Plan" within the given thirty-day period, Pilot offered to extend to Plaintiff an additional two weeks, until June 16, to improve her performance. (Pl.Dep. 214; D.Exs. 5, 6.)

69. As part of this extension, Plaintiff was instructed yet again "that the 20 order per day minimum is the standard established for people in training and that this is a daily average computed over the course of a month. With time this number will increase." (D.Ex.6.)

70. Ms. Roberts also asked Plaintiff to personally check in with her each day around lunchtime to review the status of her work. (D.Ex.6.)

71. On the days in June that Davis entered orders, she never exceeded 15 orders, entering fewer than ten on several days. (D.Ex.8/Tab D (Davis0788-0799).)

C. **Termination of Plaintiff's Employment**

72. Despite the counseling and assistance from Ms. Roberts, Ms. Faulkner and Ms. Bynes and Mr. Ferrara, Plaintiff failed to meet the performance goals. (See D.Ex. 6; D.Ex.8/Tab D; see also D.Ex.9/Tab F.)

73. Mr. Ferrara explained the basis for his decision to terminate her employment in a

termination notice:

> Lila, you have made no substantive attempts to upgrade your performance in the six weeks since the written warning, despite our making numerous accommodations to help you accomplish these goals. In fact, you have become less communicative regarding your workload, backlog and needs relative to improving your performance. Under these circumstances and in light of the fact that you show no indication that changes in your performance will occur in the future to address these problems, I have no choice but to terminate your employment.

(Pl.Dep. 223; D.Ex. 7.)

74.  Plaintiff's last day of employment with Pilot was June 29, 2000. (Pl.Dep. 224.)

## II.  ORDER FILE SUMMARY AVERAGES FOR CSRs

75.  Order File Summary forms tracked the CSRs' performance and show how many orders and lines each entered every day. (Pl.Dep. 150-51, 191-92.)

76.  It is uncontested that these reports accurately depict the CSRs' daily performance. (Pl.Dep. 157.)

77. These forms establish:

| 1999 Month/CSR | Monthly Average[8] Daily Orders Entered | Monthly Average Daily Lines Entered | 2000 Date/CSR | Monthly Average Daily Orders Entered | Monthly Average Daily Lines Entered |
|---|---|---|---|---|---|
| July 1999 | | | Jan. 2000[9] | | |
| Carre | 14.2 | 233.9 | Carre | 15 | 225.1 |
| Page | 14.7 | 295.7 | Page | 17.1 | 244.7 |
| Saska | 18.3 | 331.5 | Saska | 33.2 | 537.8 |
| **Davis** | **14.4** | **138.1** | **Davis** | **18** | **185.8** |
| Aug. 1999 | | | Feb. 2000 | | |
| Carre | 11.7 | 212.8 | Carre | 11.4 | 199.2 |
| Page | 13.9 | 244.6 | Page | 15.4 | 261 |
| Saska | 12.3 | 263.6 | Saska | 29.1 | 559.4 |
| **Davis** | **11.9** | **125.6** | **Davis** | **12.8** | **207.7** |
| Sept. 1999 | | | Mar. 2000 | | |
| Carre | 17.5 | 252.8 | Carre | 12.2 | 231.3 |
| Page | 23.1 | 294.4 | Page | 16.9 | 325.1 |
| Saska | 43.6 | 542.6 | Saska | 24.9 | 521.1 |
| **Davis** | **12.7** | **172.7** | **Davis** | **9.3** | **152.6** |
| Oct. 1999 | | | Apr. 2000 | | |
| Carre | 15 | 201.2 | Carre | 12.8 | 155.1 |
| Page | 14.3 | 272.4 | Page | 21.1 | 273.1 |
| Saska | 26.5 | 453.1 | Saska | 32.4 | 546.2 |
| **Davis** | **12.7** | **172.7** | **Davis** | **18** | **196.1** |
| Nov. 1999 | | | May 2000 | | |
| Carre | 14.1 | 196.1 | Page | 23.3 | 274.7 |
| Page | 13.3 | 253.2 | Saska | 50.3 | 711.3 |
| Saska | 31.7 | 443.8 | **Davis** | **10.4** | **153.2** |
| **Davis** | **10.5** | **154.3** | | | |
| | | | June 2000 | | |
| | | | Page | 19.7 | 111.8 |
| | | | Saska | 38.7 | 341.5 |
| | | | **Davis** | **8.5** | **125.1** |

(D.Ex.9/Tab F.)

---

[8] Averages calculated from Order File Summary forms. (D.Ex.9/Tab F.) Averages do not include days on which a CSR worked, but did not enter any orders.

[9] Defendant was not able to locate its Order File Summary forms from December 1999. It cannot determine at this date whether the originals of those forms were among the documents that Plaintiff stole from Pilot beginning on or about May 2000. (Pl.Dep. 151-53, 154, 174.) Those records were not among those produced by Plaintiff to Pilot. (See D.Ex.9/Tab F.)

Based on the foregoing undisputed facts and for the reasons set forth in the accompanying memorandum of law, Defendant respectfully requests that this Court grant its motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, and dismiss Plaintiff Lila Davis' Complaint in its entirety.

                                              PILOT CORPORATION OF AMERICA,

                                              By: _____
                                              Michael J. Soltis
                                              CT 07413
                                              Alison Jacobs Wice
                                              CT 21771
                                              JACKSON LEWIS LLP
                                              177 Broad Street
                                              P.O. Box 251
                                              Stamford, CT  06904-0251
                                              (203) 961-0404
                                              (203) 324-4704 (Facsimile)
                                              soltism@jacksonlewis.com
                                              wicea@jacksonlewis.com

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing LOCAL RULE 56(A)(1) STATEMENT has been served, via regular mail, postage prepaid, to counsel of record at the following address:

> Max F. Brunswick, Esq.
> 12 Trumbull Street
> New Haven, Connecticut 06511

This 27th day of February, 2004.

_____
Alison Jacobs Wice