

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

2004 AUG 19 P 1: 55

| | |
|---|---|
| Lila R. Davis,<br>Plaintiff | : NO. 3:01 CV 2204 (DJS)<br>: <br>: Jury Trial Demanded |
| Pilot Corporation of America,<br>Defendant | : August 16, 2004 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.   Statement of Facts

The Plaintiff is an African American woman and citizen of the United States. She was employed by the Defendant as a customer service representative from June 14, 1999 through June 29, 2000.

Before she was employed as a full time permanent employee, Plaintiff was initially hired by the Defendant as a temporary employee in June of 1999.

After submitting her application for employment in March or April of 1999, she was contacted by Chantay Bynes, the Defendant's Human Resources employee, for an interview in early June. During this interview, the Plaintiff first met with Ms. Bynes. She had a second interview the same day with John Ferrara, the customer service department manager. Several days later, she was interviewed a third time by Donna McCausland. At the conclusion of her interview with Ms. McCausland, she told Plaintiff that she would recommend to Human Resources that Plaintiff be hired to fill the position. Plaintiff demonstrated that she was duly qualified to handle the csr responsibilities having met the necessary educational and experiential requirements.

Plaintiff heard from Ms. Bynes the next day, who made a verbal offer of employment. Ms. Bynes indicated that the Defendant preferred that Plaintiff apply for the position through the McIntyre Associates (temporary employment agency) so that she could be hired as a temporary employee for a period of six months. After six (6)

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 1 of 23

months, if her performance was satisfactory, she would be hired as a permanent employee. Plaintiff followed Ms. Bynes' instructions and after renewing her application through McIntyre Associates, was hired by Defendant as temporary employee from June 14, 1999 until August 17, 1999.

Judy DeZenzio, Plaintiff's initial supervisor, was also hired in June of 1999 to replace the recently demoted supervisor, Donna McCausland. Ms. Bynes arranged for Plaintiff's start date to commence one week after Ms. DeZenzio's start date.

Ms. McCausland had been the immediate supervisor (and Ms. DeZenzio's predecessor) in the customer service department. However, she had recently been demoted after having a racially charged confrontation with Wendy Jennings, the only other African American (besides Plaintiff) employed in the customer service department from June of 1999 to June of 2000. The subject of the heated discussion was in regards the subject of Kwanzaa. Plaintiff learned of this incident several weeks after she was hired.

After she became employed by the Defendant, Plaintiff also learned from Ms. Jennings that not only had she been subjected to racially offensive remarks by Ms. McCausland, but recently, Mr. Ferrara had also repeatedly used the word "nigger" in conversation with Ms. Jennings to describe African Americans residing in Bridgeport. When she took offense to his comments, he became even more adamant and offensive in his tone. After she registered several complaints, she was offered a 10% raise as a monetary settlement.

Ms. Jennings also complained that she was repeatedly denied promotion to a csr position. The Defendant only promoted her to a csr position after Plaintiff was terminated and had filed a discrimination complaint with the State of Connecticut Commission on Human Rights and Opportunities.

Judith DeZenzio was Plaintiff's immediate supervisor from the time she was hired first as a temporary employee and continuing after her promotion to full time csr in August of 1999, until she resigned in March of 2000. Even though the Defendants wanted Plaintiff to work as a temporary employee for six (6) months, she was hired as a

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 2 of 23

permanent full time employee less than eight (8) weeks later.  Ms. DeZenzio notified her verbally of the Defendant's intention to make a full time offer of employment based on her work performance.  The written offer of employment was made by Laurie Faulkner, the Human Resources Director. John Ferrara never made any offer of employment to Plaintiff.

During the time she was employed by Defendant, Plaintiff maintained a journal in which she made daily entries of occurrences that took place on the job.  The entries, although detailed, did not constitute a complete and exhaustive record of the daily occurrences or work that Plaintiff completed in the Defendant's workplace as time did not reasonably permit Plaintiff to keep such detailed records.  However, she did attempt to record as accurately as possible the daily occurrences and work she performed in as much detail as time would permit.

Plaintiff was quickly acquainted with the somewhat racially tense atmosphere in the customer service department.  Although noone resorted to using racial slurs or approached her in the same offensive manner that her coworker Ms. Jennings had been approached, she was cognizant of the tensions and poor attitudes displayed by several of her co-workers.

For instance, on her first day at work as a temporary employee, Mr. Ferrara gave Plaintiff a guided tour of the Defendant's facilities. He informed Plaintiff that Ms. Jennings was the only person in the department that he had not introduced her to because she was on vacation but assured Plaintiff that once she met Ms. Jennings, she was certain that she would like her and they would get along.  Later, when Plaintiff met Ms. Jennings and discovered she was African American (and the only other African American employed in the customer service department) and learned of the recent racially charged incidents, she concluded that he believed they would "get along" and just because they were both African Americans.

As time passed, Mr. Ferrara expressed his displeasure with the fact that the two women had apparently developed a friendship, and often were seen talking togther or eating lunch together. He told Plaintiff that he was concerned that she would become

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 3 of 23

unduly influenced by Ms. Jennings and her opinion about occurrences in the department that took place before Plaintiff was hired.   Plaintiff understood that his references concerned the racially charged conversations he had with Ms. Jennings and concluded that he did not want her to befriend Ms. Jennings who he considered to be a troublemaker.   Plaintiff understood that he felt uncomfortable with African Americans having any type of relationships in his department in general.

Plaintiff's responsibilities as a csr included the following:   Entering customers' orders for the defendant's products (writing implements, related accessories and ink) into the defendant's computer system.   This process involved the following 18 steps to prepare ("prep") each order to be entered into the computer system:

> (1) the customer sends an order form (via facsimile or email) which is distributed to csrs by Brenda Keller, Plaintiff's former co-worker;
> (2) Some customers requested confirmation either verbally or via email that the order had been received;
> (3) As a csr Plaintiff would check to make sure the order form has a date stamp (indicating the date the order was actually received by the Defendant);
> (4) If the date stamp was missing Plaintiff would normally request that Ms. Keller stamp the order with the receipt date although this was frequently not done in a timely manner, with the result that the date stamped on a particular order did not accurately reflect the actual date that the document was received by the Defendant;
> (5) Plaintiff would then check the "sold to" (billing) and "ship to" (mailing) address categories to make certain that they are actually typed on the order form and that both addresses have already been entered into the computer system;
> (6) If the two addresses were not on the order form then Plaintiff had to telephone the customer and ask the customer to resubmit the order form with the address information completed;

Lila Davis v. Pilot Pen                                          Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 4 of 23

(7) If the address information listed on the order form had not been entered into the computer system, Plaintiff would write in the missing address information on a "Telephone Inquiry Form" and forward it to Laura Novak (a coworker employed in another department) who was responsible for arranging to have the information entered into the system. Until the address information was entered into the system by Ms. Novak, the order could not be completed. This particular portion of the process was a frequent problem for me as a csr processing orders for new customers. Ms. Novak was regularly delayed in entering the address information into the system which in turn caused a delay as far as completing my daily order entry assignments on a timely basis.

(8) Plaintiff would then check the order form to make sure the purchase order number (p.o.) was listed.

(9) If the p.o. number is not on the order form, Plaintiff would telephone the customer and to obtain the p.o. number.

(10) Plaintiff would then count the total number of lines in the order, with each line representing a different products being ordered.

(11) Plaintiff would also change listings under the "Quantity" heading on the order form reading "dozen" to read "each" because of a system wide shortcoming.

(12) Plaintiff would then total the quantity of items being ordered.

(13) Plaintiff would then total the number of lines in the order.

(14) Plaintiff would then total the prices for each item ordered.

(15) As Plaintiff would engage in checking the total price for each specific line item, Plaintiff would also check the "item number" entry on each line to be certain that it matched the entry under the "item description."

(16) If the item number did not match the item description I would telephone the customer to determine which item the customer wanted included in the order;

Lila Davis v. Pilot Pen                                      Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment
Page 5 of 23

(17) If any order form contained a duplicate line, Plaintiff would telephone the customer to make certain that the duplicated entry was not an error.

(18) Plaintiff would go into the computer system to the look up the customer's pre-assigned account number and then record that number on the order form.

Prepping an order could take anywhere from 5-20 minutes. The time involved varied depending upon the number of products included in the order, whether all necessary data was supplied by the customer on the order form, and whether any information needed from Novak was provided in a timely fashion.

After prepping each order Plaintiff would take the following steps to enter each order into the computer system:

(1) On the first screen, Plaintiff entered instructions for the delivery driver and the delivery date;

(2) On the second screen Plaintiff entered the customer's account number, p.o. number and "ship to" address; the csr also verifies the billing address;

(3) On the third screen Plaintiff would enter the quantity and item no. for the products ordered;

(4) On the fourth screen Plaintiff would enter miscellaneous/notes comments. After proofreading the data entered, Plaintiff completed the order by hitting the "enter" button.

Some customers required confirmation via email or facsimile once the order was completed.

Frequently (on a daily basis), orders were put on hold for any of the following reasons:

(1) one of the items ordered was being discontinued;

(2) a new product was not yet available in the U.S. for purchase;

(3) the order had to be split between different warehouses (Florida, California and/or Connecticut);

Lila Davis v. Pilot Pen                                      Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment
Page 6 of 23

(4) Ferraro required that orders over a certain dollar amount had to be approved by him personally; or

(5) a customer had previous orders that needed to be paid before new orders could be entered into the system.

Orders could be on hold for several hours, days or weeks and resolution of any of the five (5) issues listed above was generally beyond the control of a csr. Placing orders on hold would cause csrs to fall behind in timely completing their daily quota of order entries.

Once Plaintiff entered each order into the computer system, she would be responsible for answering corresponding follow up inquiries from any customer whose order she had actually entered into the system. Answering customers' follow up inquiries was a tedious and extremely time consuming part of a csr's responsibilities and could require that the csr perform additional research, make additional time consuming telephone calls to seek the whereabouts of a particular order, or information concerning the availability of a particular product. Oftentimes, answering any particular inquiry could involve spending anywhere from 15 minutes to two (2) hours tracking down the sought after information.

Plaintiff was also responsible for responding to a myriad of issues raised by customers and employees alike including complaints about malfunctioning pens, questions regarding new products, suggestions, requests for chartable donations, and amending or adding to orders. Responding to issues raised often required further research and additional telephone calling.

Plaintiff also completed address labels for packages mailed to customers which contained sample orders of products. They were mailed to customers who complained about purchasing defective products, or stated that they could not find a particular product or a particular style/color of a product.

Plaintiff was responsible for mailing fact sheets which described the ingredients/chemical make up of a product (especially where product had been chewed by an animal). Customers requested information concerning ink removal and Plaintiff

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment
Page 7 of 23

would mail a courtesy sample of "oops" a product used to remove most types of ink. She also traced Federal Express and U.P.S. deliveries when customers complained about not receiving orders.

Plaintiff was also responsible for filling out forms for a variety of issues including:

1.    "Return Goods Authorization" for items returned by customers;

2.    "Internal Adjustments" and "External Adjustments" to adjust a customer's bill after returning an item;

3.    Federal express/ups mailing forms;

4.    "Telephone Log" for recording the nature of all incoming and outgoing calls and the duration of each call;

Plaintiff's performance was initially evaluated in late November of 1999. She received the attached performance review with a heading that reads "Lila Davis Employee Status (90) day." **Exhibit**  At the time she received the evaluation, she had an opportunity to discuss the contents of the evaluation with  Ms. DeZenzio.  Ms. DeZenzio explained that her performance was satisfactory and she expected Plaintiff to continue to work at mastering the basic responsibilities that she had learned over the last three (3) months and to increase her capacities.

During the entire period of time that Plaintiff was under Ms. DeZenzio's supervision,  she was never advised that she was expected to keep up with daily quota (i.e. complete a certain number of telephone calls and order entries on a daily basis). During the entire period of time that she was under Ms. DeZenzio's supervision, she was never advised me that her performance was unsatisfactory in any respect.

Ms. DeZenzio explained that she would arrange for Plaintiff to have her training completed.  Until that point in time, her training had been sporadic and disorganized and had not yet been completed.

Due to the chaos in the customer service department at the time she was hired, Plaintiff had to rely on a deficient training process.  Instead of having one organized formal training session, Plaintiff was provided multiple piecemeal training sessions that

Lila Davis v. Pilot Pen                                                                Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment
Page 8 of 23

began when she was first hired as a temporary employee in June and were spread out in a disorganized fashion continuing into December of 1999.

Plaintiff believed the major reason that her training was carried out in a piecemeal manner was that when she was hired in June of 1999, no one was prepared to train her. Her current supervisor, Ms. DeZenzio could not train me while she was still learning the job. Therefore, I was given over to Mr. Ferrara who provided orientation to her and Diane Saksa and Sandy Landro, fellow csrs, who sporadically trained her.

Mr. Ferrara provided a portion of orientation to Plaintiff during her first week. After she became a full time, permanent employee she reminded Ms. DeZenzio that she had not been fully trained nor had her orientation been completed. Ms. DeZenzio approached Mr. Ferrara and arranged for him to complete her orientation which took place in the late fall of 1999.

Ms. Saksa provided several hours of training to Plaintiff in June on general order entry work. She resumed training Plaintiff on September 13, 1999, on how to handle international orders. Sandy Landro provided several hours of training to Plaintiff in December of 1999 to handle EDI accounts, a special ordering procedure.

The nature of work in the customer service department involved periods of peaks and valleys in customer sales. During certain seasons, sales peaked for longer periods of time and due to the increased volume of customer orders, csrs were more prone than normal to falling behind in completing their order entry assignments. They could fall behind up to two (2) days in their work.

Under Ms. DeZenzio's supervision, during periods of peaked sales, she would take steps such as allowing the csrs to work overtime, or half hour lunches. Her more frequent response during these periods of increased sales volume would be to have csrs who were momentarily caught up with their order entry work or not as far behind provide assistance to other csrs who were further behind.

In March of 2000, Ms. DeZenzio resigned and the department was again without a supervisor. Mr. Ferrara took on the supervisory role in addition to his role as manager until Patricia Roberts was hired and commenced as supervisor on April 3, 2000.

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 9 of 23

When Plaintiff first met Ms. Roberts, April 4, 2000, they sat together at Plaintiff's work station for approximately ninety (90) minutes and Plaintiff demonstrated how she carried out her work related duties. Ms. Roberts indicated to Plaintiff that she had done a good job explaining her work and that she was a good teacher.

However, after April 4, 2000, Ms. Roberts' mood changed drastically and she began to change Plaintiff's work routine. The changes Ms. Roberts made to Plaintiff's work load and work routine were of nature that while Plaintiff continued to perform the same work responsibilities, she was not credited for all of the work she did. In addition, Ms. Roberts took it a step further, adding to Plaintiff's daily responsibilities, again without giving her proper credit for the additional work she performed.

Plaintiff has cited to several example to illustrate the two claims cited above. After April 4, 2000, Ms. Roberts required that Plaintiff prepare ("prep") several orders (usually 10-20) daily that were already assigned to Plaintiff by Brenda Keller so that they would be ready for entry into the Defendant's computer system as described above. After completing the prepping, Ms. Roberts would than take the order and enter it into the system herself instead of allowing Plaintiff to complete the transaction by entering the order into the computer system.

The significance of this change in procedure was that once whoever entered the order into the system, would receivee the credit for that entire order entry notwithstanding the fact that the one who entered the order into the system may not have been the one who prepped the order. This placed an unfair disadvantage to Plaintiff since prepping an order took a great deal of time and the actual steps involved in entering the order into the computer system was relatively brief work compared to prepping.

Later in May when two new temporary employees were hired in the customer service department, Ms. Roberts would order Plaintiff to prep orders that were already assigned to Plaintiff and then allow the two temporary employees to enter the orders on the computer system. Again this allowed the two temporary employees to receive credit for all of the work involved.

Lila Davis v. Pilot Pen                              Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 10 of 23

In essence, Plaintiff did all of the "dirty work" and Ms. Roberts and the two temporary employees received the credit for completing the last few brief steps in completing order entries. This practice continued until Plaintiff was terminated. This practice did not occur with any other csr other than Plaintiff.

Another practice that Ms. Roberts instituted was that Plaintiff was required to fax written confirmation that orders had been received to customers not only for orders she entered into the computer system, but also for orders entered by other csrs. This practice did not occur with any csr other than Plaintiff.

Ms. Roberts also required that Plaintiff prepare packages with replacement products to be forwarded to customers in response to complaint letters. This was a responsibility that heretofore had been part of Brenda Keller's clerical duties. When Ms. Keller was too busy to prepare these packages, she would enlist the aid of Brenda Smorto and Jeanette Hirsch (clerical/secretarial employees) to complete the work. On occasion when Ms. Keller's backlog was extremely high, the csr's would be permitted to prepare these packages as *overtime work*.

However, after Ms. Roberts was hired, Plaintiff was required to prepare these packages during her regular shift (as opposed to overtime work). This added responsibility was assigned to Plaintiff only and was not required of the other csrs. This additional assignment cost her anywhere between fifteen (15) minutes to two (2) hours per day.

Ms. Roberts required that Plaintiff provide telephone coverage for all csrs and the two temporary employees for several hours, two (2) or three (3) days per week for the entire month of June of 2000. Because Plaintiff was left by herself to cover six (6) lines, she had very little time to complete the order entry assignments given to her. She was not credited for answering all of these telephones calls because she could not keep her telephone log updated with the high volume of telephone calls she was answering at the time. On the days that this added assignment was given to Plaintiff she lost an additional thirty (30) to ninety (90) minutes per day. No other csr was required to cover the telephones as Plaintiff was.

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 11 of 23

For a three (3) week period (April-May), Plaintiff served as back up for Sandy Landro, who was assigned EDI accounts. Ms. Landro, who had unsuccessfully applied for the supervisor position when Ms. DeZenzio resigned, was job hunting at the time and was using her vacation/personal time for a series of interviews she arranged. However, before she was able to accept any outside offers, she was offered a promotion within the Defendant's organization which she accepted. During the period of time when she was interviewing, Plaintiff processed her EDI accounts  The EDI accounts were orders that were generated totally by computer and required a shorter, easier procedure to complete.

Plaintiff was never credited for completing the EDI order entry assignments. Had she been properly credited for these orders, it would have significantly increased the number of orders credited to her. These occurrences were specially reserved for Plaintiff and no other csr was required to work that she was not credited for.

On at least three (3) occasions in May or June, Ms. Roberts added yet another assignment to Plaintiff's tasks that she was not given credit for performing. In fact, Ms. Roberts specifically instructed Plaintiff not to include the specific order numbers to a log that she handed in to Ms. Roberts on a daily basis. These orders, Camex orders were normally assigned to another csr but on several occasions, Plaintiff completed the Camex orders at Ms. Roberts directive.

In May and June, Ms. Roberts ordered Plaintiff to begin to amend orders or answer customer inquiries relating to orders that had been entered by either the other csrs or the two (2) temporary employees. Prior to this, when a csr entered an order into the computer system, she was responsible for any amendments or follow up inquiries thereto. However, Ms. Roberts began to require that Plaintiff not only complete inquiries relating to order entries she completed, but that Plaintiff also handle other csr's subsequent inquiries. This additional time consuming work did not serve as a credit to increase her required daily quotas and more importantly freed her fellow csrs (and temporary counterparts) to have more time off the telephones to complete their order entry work and maintain their high production numbers. No other csr was

Lila Davis v. Pilot Pen                                          Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 12 of 23

required to handle follow up inquiries or make amendments on orders that she did not originally process.

The scenarios described above were not the only manners in which Plaintiff was cheated by Ms. Roberts from being properly credited for the work she performed. As stated above, Brenda Keller would distribute customer orders to the various csrs. Before distributing the orders she would date stamp the order. However, orders were redistributed per Ms. Roberts on a daily basis and were generally redirected to her to process.

This redistribution of work commenced in May, occurring several times per week. By June this was a daily occurrence. These orders would have already been placed by Ms. Keller with another csr for entry and would have likely been on the csr's desk for 1-2 (or more) before Ms. Roberts would direct that the order be redistributed to Plaintiff.

Plaintiff tried to document this occurrence by asking Ms. Keller to re-stamp the orders to reflect the date that she actually received the redistributed order. She also made computer entries in the comments section on the fourth screen. Eventually, Ms. Roberts ordered her to stop documenting this information on the comments screen. The significance of receiving redistributed work was that Plaintiff was blamed for allegedly creating a backlog of order entries when in fact, some of the orders that were part of her so-called backlog were the redistributed orders described above. Plaintiff had no control over the untimely handling of redistributed orders which were already part of another csr's backlog.

The csrs were ordered by Ms. Roberts to record a summary of every incoming and outgoing telephone call, the duration of each telephone call and the number of orders processed on a computer generated spreadsheet. In fact, Plaintiff taught Diane Saksa how to record summaries of telephone calls on an earlier version of the spreadsheet used before Ms. DeZenzio resigned. Notwithstanding Ms. Roberts' orders that Plaintiff continue to use an updated version of the spreadsheet, all of the other csrs were permitted to stop using the spreadsheet to document their calls and the number of

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
                    Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 13 of 23

order entries they completed each day.  This extra work took approximately thirty (30) to forty five (45) minutes per day to complete.

On April 26, 2000, Ms. Roberts approached Plaintiff's desk and while sifting through her personal belongings, saw pills in a small colored plastic container.  She demanded that Plaintiff tell her if the pills were medication prescribed to her by a doctor.

Plaintiff repeatedly refused to answer the question even though Ms. Roberts repeated the question at least three (3) times, with the volume of her voice increasing significantly every time she repeated the question.  She was so loud until at one point Ms. Jennings asked her to lower her voice because she could not hear the caller on the other line of a telephone call she was handling. Ms. Roberts did not poke around on the desks of Plaintiff's other coworkers, nor did she delve into their personal medical affairs.

On May 30, 2000, Brenda Keller and Plaintiff arrived at the entrance to the Defendant's work site at approximately 8:29 a.m.  Plaintiff arrived at my desk by 8:31 a.m.  Both Ms. Keller and Plaintiff were both one (1) minute late. Plaintiff was verbally reprimanded by Ms. Roberts.

After Plaintiff was reprimanded, she later saw Ms. Keller and asked her if Ms. Roberts had approached her about being late.  Ms. Keller denied that Ms. Roberts approached or reprimanded her for being one minute (1) late.  Plaintiff proceeded to tell Ms. Keller that Ms. Roberts had reprimanded for being one (1) minute late.  Ms. Keller expressed her surprise upon hearing this and later went to Ms. Roberts to explain that neither she nor Plaintiff was tardy to work that day.

Ms. Roberts subsequently accosted Plaintiff in her office.  She was yelling and very angry at Plaintiff and told Plaintiff that she had no business discussing her personnel related matter with Ms. Keller.   Plaintiff was greatly humiliated and in shock as a result of Ms. Roberts' unprofessional display.  While both Ms. Keller and Plaintiff walked into work side by side that day, Plaintiff was the only one who was reprimanded for being one (1) minute tardy.

There were certain order forms labeled "Open Stock" that were filled out for customers that called their orders into the Defendant.  The "Open Stock" order forms

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
          Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment
                                                Page 14 of 23

were filled out by the Defendant's salespeople.  Due to the size and quality of the print, as well as the fact that the forms were forwarded to the customer service department by fax after being photocopied on smaller pages, these forms were impossible to read even with perfect vision.

Prior to Ms. DeZenzio's departure in March of 2000, she made a point of distributing these forms in an even handed manner so that no one csr was inundated more so than her counterparts with having to process orders printed on these forms. However, when Ms. Roberts commenced employment, she gave these forms to Plaintiff exclusively.  When Plaintiff asked her why she was the only being given these forms, Ms. Roberts' reply was that Plaintiff would just have to handle it, the work must be done. No other csr was required to read and process these forms but Plaintiff.  Needless to say, they were time consuming beyond normal, because I would have to photocopy and enlarge each one of these forms.  Sometimes Plaintiff would ask the salesperson to fax it again in hopes of having a clearer copy.

Plaintiff work product and conduct was scrutinized much more severely than that of her coworkers.  Moreover, the Defendant utilized a double standard for evaluating her work as compared to that of her similarly situated coworkers.  Plaintiff's work load at least doubled after Ms. Roberts was hired, yet she was expected to keep up with her normal workload and the new assignments given to her without having any extra time to complete the additional work.

In addition, Plaintiff had to spend extra time reporting to Ms. Roberts twice per day what work she had accomplished on an hourly and even minute by minute basis.

The discriminatory treatment she received at the hands of Ms. Roberts as has been detailed above was unwarranted and was ultimately motivated by Ms. Roberts contempt for Plaintiff's race and color.

Plaintiff termination was unfair and based on her race and color.  Plaintiff's termination was not based on the fact that her work was unsatisfactory.  It could not have been based on her performance since her opportunity to perform well was being manipulated by Ms. Roberts. Any assertions to the contrary are pretextual cover ups for

Lila Davis v. Pilot Pen                                                                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment
Page 15 of 23

the Defendant's discriminatory animus. The Defendant and its' agents were fully aware that Plaintiff was being treated differently than her similarly situated coworkers in terms of the quantity and quality work assigned to her. The Defendants were also aware that Plaintiff's work product and conduct were being subjected to a much harsher review than that of her counterparts.

## II.    Statement of Law - Summary Judgment Motions on Title VII Claims

In making their appeal for summary judgment, the Defendant must establish that there are no genuine issues of material fact and that the it is entitled to judgment as a matter of law. Fed.R.Civ.P 56(c); *Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 128 (2d Cir. 1996); *Tomka v. Seiler Corp.,* 66 F.3d 1295 (2nd Cir. 1995). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Reed v. State of Connecticut,* 161 F.Supp.2d 73, 79 (2001) (citing *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992).

"[I]n ruling on a summary judgment motion, 'the court must resolve all ambiguities and draw all reasonable inferences in favor of [the non-moving party].'" *Rosen v. Thornburgh,* 928 F.2d 528, 533 (1991) (citing *Patrick v. LeFevre,* 745 F.2d 153, 158 (2d Cir.1984). The Plaintiff opposing the motion for summary judgment must go beyond making mere allegations and/or denials of the Defendant's pleadings and must clearly present facts that show that there is a genuine issue for determination at trial. *Reed v. State of Connecticut,* 161 F.Supp.2d at 79.

"'Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper.' *Bryant v. Maffuci,* 923 F.2d 979, 982 (2d Cir.) *cert den'd,* 502 U.S. 849, (1991). If the Plaintiff submits evidence that is 'merely colorable,' or is

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 16 of 23

not 'significantly probative,' summary judgment may be granted. *Anderson [v. Liberty Lobby]*, 477 U.S. [242,] 249-50 [(1986)]."

### 1.    Statement of Law-Title VII Race Based Discrimination

The Plaintiff contends that there are several disputed material issues of fact, by which this should conclude precludes granting the Defendant's summary judgment motion. In determining whether summary judgment is to be denied, an initial review of the Plaintiff's underlying discrimination and retaliation claims is in order, relying on the "three-part burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*," 411 U.S. 792 (1973). *Tomka,* 66 F.3d at 1308; *Reeves v.* Sanderson, 530 U.S. 133, 143 (2000); Texas *Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53, (1981*); St. Mary's Honor Ctr. V. Hicks,* 509 U.S. 502, 506-08, (1993).

In order to establish a prima facie case, the Plaintiff must show that she is a member of a protected class, was qualified for the position in question, and was subjected to discriminatory conduct, discipline and/or termination, and that the conduct complained of occurred under circumstances which give rise to an inference of racial discrimination. *Reeves*, 530 U.S. at 143; *McDonnell Douglas,* 411 U.S. at 802.

Once the Plaintiff makes out her prima facie case, the burden of production shifts to the Defendant who must present a legitimate, nondiscriminatory explanation for the adverse employment decision complained of. *Id.* The burden of proof then shifts back to the Plaintiff who must ultimately establish by a fair preponderance of the evidence that the explanations advanced by the Defendant are in reality a pretext for discrimination. *Id.*

Lila Davis v. Pilot Pen                                        Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 17 of 23

"Also relevant to this inquiry is our recognition that employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent. . . A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence. . . . Consequently, in a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate. *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir. 1991).

> "'In the employment discrimination context, courts must be sensitive to the fact that evidence of discrimination is generally not overt: 'employers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law.' *Bickerstaff v. Vassar College,* 196 F.3d 435, 447 (2d. Cir. 1999) (internal quotations omitted). Courts must also 'carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture ... Thus, the question is whether the evidence can *reasonably* and *logically* give rise to an inference of discrimination under all of the circumstances.' Id. (emphasis added). Furthermore, when the case involves a claim of discrimination, the court should view the record in its totality, rather than in a piecemeal fashion. *Fitzgerald v. Henderson,* 251 F.3d 345, 360 (2d Cir. 2001), *cert. denied sub nom, Potter v. Fitzgerald,* 536 U.S. 922 (2002).

The Second Circuit has directed that trial courts 'be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination.' Belfi v. Predergast, 191 F.3d 129, 135 (2d Cir. 1999); *see also* Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223 (2d Cir. 1994) ('Because writings directly supporting a claim of

Lila Davis v. Pilot Pen                                          Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment
Page 18 of 23

intentional discrimination are rarely, if ever, found among an employer's corporate records, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination')." *Bailey v. Colgate-Palmolive Co*, 2003 U.S.Dist. LEXIS 8175, No. 3:99 Civ. 3228 (CBM) (S.D.N.Y. May 14, 2003).

### III.    <u>Argument</u>

There are several material facts in dispute. The first and most important dispute concerns the quality of Plaintiff's work. In essence Defendant claims that Plaintiff worked too slowly and failed to fulfill her daily quota or order entries. However, Plaintiff does not agree with this assessment of her performance and has taken great pains to present evidence that this conclusion was a deliberate lie.

First, Plaintiff has presented several examples illustrating how Defendant, through its agents, primarily Ms. Roberts, began adding assignments, on a day to day basis, to Plaintiff's workload that she was not properly credited for performing. **See Plaintiff's Local Rule 56(a)(2) Statement ¶s 33-50; Affidavit for Lila Davis ¶s 52-59.** Ms. Roberts claims on the one hand that Plaintiff was so slow at performing her order entry work that it had to be redistributed on occasion to Plaintiff's fellow csrs. However, Plaintiff has produced documents which clearly substantiate her claim that she was regularly given orders to process that had been received by the Defendant several days earlier than the date that the order was assigned to Plaintiff to process. **See Exhibits 27-31.** In other instances, Plaintiff was given redistributed order entry assignments (or follow work related to old orders) that had first been assigned to other fellow csrs who

Lila Davis v. Pilot Pen                                              Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment
Page 19 of 23

had not completed the work in a timely fashion or had made errors. **See Exhibits 8, 10, 19, 26.**

Plaintiff has testified that and produced papers that clearly reflect the fact that she was performing not only her own work, but work that should have been completed by her co-workers. In addition, Plaintiff has testified that she spent a great deal of time training or cleaning up the errors of three (3) temporary employees employed in the customer service department, namely, Erin Sanchez, Jaime Lieto and a third with the initials A. V. (Plaintiff does not recall her name). **See Plaintiff's Local Rule 56(a)(2) Statement ¶s 33, 38-39; See Exhibits 22-25.**

Finally, Plaintiff was given extra assignments to do that were not required of her similarly situated co-workers. **See Plaintiff's Local Rule 56(a)(2) Statement ¶s 40-42; Affidavit for Lila Davis ¶s 52-59.** The significance of the extra work given to the Plaintiff lies in the fact that Plaintiff would attempt to document the extra work she was performing, by making handwritten notations of the actual dates she was given order entry work that had sat on her coworkers' desks for days before the same orders were redirected to her. Plaintiff also attempted to document the reassignment of order entry (or follow up work) by typing notes onto the computer screens' comments sections to reflect that the order was originally assigned to some other csr and that Plaintiff was ordered to correct errors made by the csr who originally processed the order. Plaintiff would frequently request that Ms. Keller restamp order to reflect that the order had been re-assigned for a second (or third) time. However, her supervisor, Ms. Roberts, ordered

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 20 of 23

Plaintiff to refrain from creating such documentation when she caught onto what Plaintiff was doing.  **See Plaintiff's Local Rule 56(a)(2) Statement ¶s 36, 50.**

Notwithstanding defense claims that Plaintiff was having trouble keeping up with her own work assignments, they do not seem willing to admit that the real reason Plaintiff could not  keep up with her regularly assigned work was because Ms. Roberts gave Plaintiff so many other additional assignments to complete that it was not possible for Plaintiff to keep up.  Plaintiff has repeatedly stated throughout her affidavit the fact that her fellow csrs were not treated as she was.

Most significantly is Plaintiff's offer of evidence in the form of statements from two women who served in the same supervisory capacity as Patricia Roberts, that is, Judy DeZenzio and Donna McCausland.  DeZenzio has confirmed in her affidavit (which is forthcoming) that she never told Plaintiff or any other csr that there was a quota concerning the number of order entries that csrs were expected to complete on a daily basis.  In a conversation with McCausland several weeks before her termination, Plaintiff has testified that McCausland told her in so many words that maintaining a quota for csrs was practically unworkable because of the nature of the business.  **See Plaintiff's Local Rule 56(a)(2) Statement ¶ 55.**

There are many more points of disagreement between the parties that have been cited and described in painstaking detail in Plaintiff's Local Rule 56(a)(2) Statement and the accompanying affidavits and exhibits.  In essence, while the Defendant claims the Plaintiff was too slow and could not keep up with an established quota, Plaintiff intends to prove that there was no quota, in fact.  The truth of the matter

Lila Davis v. Pilot Pen                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment
Page 21 of 23

is that the nature of Defendant's business found the csrs in a constant flux where the csrs were either barely staying ahead of their order entry work, or else falling behind on a regular basis. **See Affidavit for Judy DeZenzio.** In fact, the various peaks and valleys in consumer ordering was so well noted that even Ms. Roberts found herself making department wide pleas for participation in gimmicks or incentives to the workers at large to attack backlogs.

The discussion of quotas was a pretextual reason Plaintiff's termination. There are so many facts that are in need of discernment and review for the truth that the Plaintiff's case must necessarily be submitted for jury trial. Therefore, Defendant's Motion for Summary Judgment should be denied.

The Plaintiff,
Lila Davis

By: _____

Max F. Brunswick, Esquire
Attorney for the Plaintiff
12 Trumbull Street
New Haven, CT 06511
203/562-4024 (o)
203/782-5979 (f)

ORAL ARGUMENT REQUESTED
TESTIMONY NOT REQUIRED

Lila Davis v. Pilot Pen                                                    Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 22 of 23

## CERTIFICATION

This is to certify that on this date a copy of the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT, and PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT** has been hand delivered/forwarded via first class U.S. mail, postage prepaid to the following counsel and/or pro se parties of record:

Jackson, Lewis, Schnitzler & Krupman
177 Broad Street
P.O. Box 251
Stamford, CT  06904-0251


_____
Max F. Brunswick, Esquire

Lila Davis v. Pilot Pen

Objection to Defendant's Motion for Summary Judgment
Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment

Page 23 of 23