FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2004 AUG 19  P 1: 56

U.S. DISTRICT
C.T.

| | |
|---|---|
| Lila R. Davis,<br>Plaintiff | : NO. 3:01 CV 2204 (DJS) |
| | : |
| | : Jury Trial Demanded |
| Pilot Corporation of America,<br>Defendant | : August 16, 2004 |

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

Now comes the Plaintiff, Lila R. Davis, by counsel and pursuant to Local Rule 56(a)(2)
hereby submits her statement of disputed facts.

1.    Plaintiff who was well qualified for the position, was hired to work as a temporary
      employee for the Defendant by decision of Donna McCausland and Chantay
      Bynes.  **See Affidavit for Lila Davis, ¶s 10-11; Exhibit 17, Plaintiff's resume,
      submitted with her application, which lists her qualifications.**

2.    Plaintiff was hired to work as a permanent employee for the Defendant by
      decision of Judy DeZenzio and Laurie Faulkner.  **See Affidavit for Lila Davis,
      ¶s 6, 18; Exhibit 1, Offer of Employment Letter dated 8/4/99.**

3.    As part of Plaintiff's multiple responsibilities as a customer service
      representative, she was responsible for the following duties:  Entering customers'
      orders for the defendant's products (writing implements, related accessories and
      ink) into the defendant's computer system.  This process involved the following
      18 steps to prepare ("prep") the order to be entered into the computer system:
      (1) the customer sends an order form (via facsimile or email) which is
      distributed to customer service representatives by Brenda Keller, a co-
      worker;
      (2) Some customers requested confirmation either verbally or via email that
      the order had been received;
      (3) The csr checks to make sure the order form has a date stamp (indicating
      the date the order was actually received by the Defendant);

(4) If the date stamp is missing the csr requested that Ms. Keller stamp the order with the receipt date;

(5) The csr checks the "sold to" (billing) and "ship to" (mailing) address categories to make certain that they are typed on the order form in and that both addresses have already been entered into the computer system;

(6) If the two addresses are not on the order form then she must call the customer and ask the customer to resubmit the order form with the address information completed;

(7) If the address information listed on the order form has not been entered into the computer system, she would write in the missing address information on a "Telephone Inquiry Form" and forward it to Laura Novak (a coworker employed in another department) who was responsible for arranging to to have the information entered into the system.  Until the address information was entered into the system by Ms. Novak, the subject order could not be completed.  This particular portion of the process was a frequent problem for customer service representatives processing orders for new customers.  Ms. Novak was regularly delayed in entering the address information into the system which in turn caused a delay which caused delays with customer service representatives completing their daily order entry assignments on a timely basis.

(8) The csr checks the order form to make sure the purchase order number (p.o.) is listed.

(9) If the p.o. number is not on the order form the csr telephones the customer and to obtain the p.o. number.

(10)  The csr then counts the number of lines in the order, with each line representing a different products being ordered.

(11) The csr also had to change listings in the "Quantity" heading on the order form from "dozen" to the word "each" because of a system wide shortcoming.

(12)  The csr would then total the quantity of items being ordered.

(13)  The csr would then total the number of lines in the order.

(14)  The csr would then total the prices for each item ordered.

(15) As the csr checks the total price for each specific line item, she would also check the "item number" entry on each line to be certain that it matched the entry under the "item description."

(16) If the item number did not match the item description the csr would telephone the customer to determine which item the customer wanted included in the order;

(17) If any order form contained a duplicate line, the csr would telephone the customer to make certain that the duplicated entry was not an error.

(18) The csr would go into the computer system to the look up the customer's pre-assigned account number and then record that number on the order form.  4. **See Affidavit for Lila Davis, ¶ 23; See Affidavit for Judy DeZenzio, ¶; Exhibits 2-3; Job Descriptions for Customer Service Representative.**

4.      Prepping an order could take anywhere from 5-20 minutes.  The time involved varied depending upon the number of products included in the order, whether all necessary data was supplied by the customer on the order form, and whether any information needed from Novak was provided in a timely fashion.  **See Affidavit for Lila Davis, ¶ 23; See Affidavit for Judy DeZenzio to be submitted upon receipt by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

5.      After prepping the order the csr takes the following steps to enter the order into the computer system:

(1) On the first screen, the csr enters instructions for the delivery driver and the delivery date;

(2) On the second screen the csr enters the customer's account number, p.o. number and "ship to" address; the csr also verifies the billing address;

(3)  On the third screen the csr enters the quantity and item no. for the products ordered;

(4) On the fourth screen the csr enters miscellaneous/notes comments.  After proofreading the data entered, the csr completes the order by hitting the "enter" button.  **See Affidavit for Lila Davis, ¶ 24; See Affidavit for Judy DeZenzio to be submitted upon receipt by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

6.     Some customers required confirmation via email or facsimile once the order was completed.  **See Affidavit for Lila Davis, ¶ 25; See Affidavit for Judy DeZenzio  to be submitted  upon receipt by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

7.     Frequently (on a daily basis), orders were put on hold for any of the following reasons:

(1) one of the items ordered was being discontinued;

(2) a new product was not yet available in the U.S. for purchase;

(3) the order had to be split between different warehouses (Florida, California and/or Connecticut);

(4) Ferraro required that orders over a certain dollar amount had to be approved by him personally;

(5) a customer had previous orders that needed to be paid before new orders could be entered into the system.  **See Affidavit for Lila Davis, ¶ 26; See Affidavit for Judy DeZenzio to be submitted upon receipt by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

8.     Orders could be on hold for several hours, days or weeks and resolution of any of the five issues listed above was generally beyond the csr's control.  Placing orders on hold caused csrs to fall behind in timely completing their daily quota of order entries.  **See Affidavit for Lila Davis, ¶ 26; See Affidavit for Judy DeZenzio to be submitted upon receipt by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

9.     Once she entered any particular order into the computer system, the csr was responsible for answering corresponding follow up inquiries for any customer

whose order she had actually entered into the system. Answering customers' follow up inquiries was a tedious and extremely time consuming part of a customer service representative's responsibilities that involved a possibility of performing research, making additional time consuming telephone calls to seek the whereabouts of a particular order, or information concerning a particular product. Oftentimes, answering any particular inquiry could involve spending anywhere from 15 minutes to two (2) hours tracking down the sought after information. **See Affidavit for Lila Davis, ¶ 27; See Affidavit for Judy DeZenzio to be submitted upon receipt by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

10.  Csrs responded to a myriad of issues raised by customers and employees alike including complaints about malfunctioning pens, new products, suggestions, donations, and amending or adding to orders. Responding to issues raised often required further research and additional telephone calling. **See Affidavit for Lila Davis, ¶ 28; See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

11.  Csrs also completed address labels for packages mailed to customers which contained sample orders of products. They were mailed to customers who complained about purchasing defective products, or stated that they could not find a particular product or a particular style/color of a product. **See Affidavit for Lila Davis, ¶ 29; See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

12.  Csrs mailed fact sheets which described the ingredients/chemical make up of a product (especially where product had been chewed by an animal). **See Affidavit for Lila Davis, ¶ 30; See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

13.  Customers requested information concerning ink removal and csrs would mail a courtesy sample of "oops" a product used to remove most types of ink. **See**

**Affidavit for Lila Davis, ¶ 31; See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

14.    Csrs traced federal express and ups deliveries when customers complained about not receiving orders. **See Affidavit for Lila Davis, ¶ 32; See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

15.    Csrs filled out forms for a variety of issues including:

   (1)    "Return Goods Authorization" for items returned by customers;

   (2)    "Internal Adjustments" and "External Adjustments" to adjust a customer's bill after returning an item;

   (3)    Federal express/ups mailing forms;

   (4)    "Telephone Log" for recording the nature of all incoming and outgoing calls and the duration of each call. **See Affidavit for Lila Davis, ¶ 33; See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

16.    The defendant's assertions, through its employees, Roberts and Ferrara that Plaintiff failed to complete her daily order entries at an appropriate pace is inaccurate and misleading. **See Affidavit for Lila Davis, ¶s 51-59, 62, 63.**

17.    Roberts did not use or have access to any reliable objective method of accurately tracking the amount of time spent by csrs on their individual tasks. In fact, many csr assignments that involved telephone work, required that the csr record the time that she spent on each such telephone call, thus allowing for the manipulation of records. Csrs spent a great deal of time on the telephone responding to customer or employee inquiries and complaints. **See Affidavit for Lila Davis, ¶s 23, 26-28, 30, 32, 51-59, 62, 63; See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

18.    Roberts did not use or create any uniform system of distributing the work load to ensure that each csr had an equivalent number/amount of tasks assigned.

Indeed based on the variables involved in completing many of the typical csr tasks, such a system would have been nearly impossible to create. The variables involved included a csr's reliance on the customers or other employees to provide information or complete smaller tasks, without which the csr could not complete her own tasks. **See Affidavit for Lila Davis, ¶s 23, 26-28, 30, 32, 51-59, 62, 63; See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

19.   In fact, after Ms. Roberts became Plaintiff's immediate supervisor, Plaintiff did in fact perform her work tasks at a similar rate as compared to that of her fellow csrs. **See Affidavit for Lila Davis, ¶s 51-59, 62, 63.**

20.   Plaintiff and her fellow csrs were equally prone to falling behind in completing their daily assignments. This problem was more frequently recognized in the completion of order entry assignments during certain seasons of the year when customer sales peaked. Ms. Roberts herself utilized incentive plans to try to deal with the tremendous backlog csrs accumulated throughout the years. **See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized; See Affidavit for Lila Davis, ¶ 46-48; Exhibit 4a-e, 4 page Incentive Plan Memo to csrs from Ms. Roberts.**

21.   The numerous occasions when Plaintiff fell behind in keeping up with her daily work assignments was not significantly greater than that of her fellow csrs especially when taking into consideration the fact that Ms Roberts, her supervisor, changed and increased Plaintiff's workload without doing the same for her similarly situated coworkers. **See Affidavit for Lila Davis, ¶s 51-59, 62, 63; See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

22.   Defendant's assertion that Plaintiff failed to complete her daily assignments in a timely manner over a period of time so as to justify her termination (and presumably that Plaintiff's fellow co-workers, unlike her, completed their

assignments in a timely manner) is false and misleading.  **See Affidavit for Lila Davis, ¶s 51-59, 62, 63.**

23.   Plaintiff's first supervisor, Judy DeZenzio, never believed Plaintiff's work pace was unsatisfactory as compared to the work pace that her fellow customer service representatives.  **See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized; See Affidavit for Lila Davis, ¶s 34-39.**

24.   In fact Judy DeZenzio believed that Plaintiff, who at the time she supervised her was a brand new employee, was learning the job at a sufficient pace.  **See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it  notarized; See Affidavit for Lila Davis, ¶s 34-39.**

25.   Judy DeZenzio wrote an evaluation of Plaintiff's performance 90 days after she commenced working as a permanent full time employee.  Plaintiff dated her review and responsive comments to the evaluation as November 17, 1999.  **Exhibit 18a-18b, Plaintiff's ninety (90) performance review written by Judy DeZenzio in November of 1999.**

26.   In her written evaluation, Mrs. DeZenzio found that Plaintiff was performing in a satisfactory manner and indicated that as of the date of the evaluation, Plaintiff had learned the basic responsibilities of her position as csr and had proved herself to be "*valued member of the team*".  (Emphasis added.)  She further indicated that she expected that Plaintiff would further her professional development by beginning to "create the routine that will help her to realize her maximum potential."  **Exhibit 18a-18b, Plaintiff's ninety (90) performance review written by Judy DeZenzio in November of 1999; See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized; See Affidavit for Lila Davis ¶s 34-39.**

27.   Mrs. DeZenzio was never aware of a quota (for the sake of work production) that any csr was expected to adhere to.  **See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized.**

28.  Judy DeZenzio believed that Plaintiff, who at the time she supervised her was a brand new employee, was performing her order entry assignments at a normal pace, especially compared to that pace at which her fellow customer service representatives performed.  **See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized; See Affidavit for Lila Davis, ¶s 34-39.**

29.  When any one of Plaintiff's fellow customer service representatives fell behind in completing their daily work assignments, Judy DeZenzio would often redistribute that particular customer service representative's work to Plaintiff and the other customer service representatives to assist such a one in "catching up."  **See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized;  See Affidavit for Lila Davis, ¶s 46-48.**

30.  Such redistributions would often place a customer service representative, who at that point in time was "caught up" or nearly "caught up," behind in her work, however, such was the nature of the workload that the Plaintiff and her co-workers were accustomed to and grew to expect on a day to day basis.  **See Affidavit for Judy DeZenzio to submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized;  See Affidavit for Lila Davis, ¶s 46-48; Exhibit 4a-e, 4 page Incentive Plan Memo to csrs from Ms. Roberts.**

31.  DeZenzio never made Plaintiff or her fellow customer service representatives aware of a specific mandatory daily quota that they were required to meet as it concerned the number of order entries to be completed on a daily basis.  **See Affidavit for Judy DeZenzio to be submitted by Plaintiff's counsel after Mrs. DeZenzio has it notarized;  See Affidavit for Lila Davis, ¶ 37.**

32.  After Patricia Roberts was hired (on or about April 3, 2000), replacing DeZenzio as Plaintiff's supervisor, she altered Plaintiff's daily work load, greatly adding to it, and at the same time notified Plaintiff of her expectation that she input a minimum number or order entries every day.  **See Affidavit for Lila Davis, ¶s 51-59, 62, 63.**

33. Much of the additional work assigned to Plaintiff (above and beyond the normal workload of a typical customer service representative) was work generated by two temporary employees (Erin Sanchez and Jaime Lieto) who were hired as customer service representatives and were assigned to work in Plaintiff's department.    Some of the additional work assigned to Plaintiff pertained to the type of redistributed work referred to above. **See Affidavit for Lila Davis, ¶s 51-53, 55, 57.**

34. However Roberts did not similarly increase the work load of Plaintiff's fellow customer service representatives. **See Affidavit for Lila Davis, ¶s 51-59, 62, 63.**

35. Although during Plaintiff's employment with the defendant, the defendant maintained computer generated records recording the number of order entries and telephones inquiries completed by each customer service representative each day, the additional work assignments given to Plaintiff by Roberts were not included in such records.   Therefore, Plaintiff was not properly credited for the work she performed by the defendant. **See Affidavit for Lila Davis, ¶s 51-59, 62, 63.**

36. When Roberts caught on that Plaintiff was making efforts to document the extra work she was assigned to complete, she specifically told Plaintiff not to create such records.   **See Affidavit for Lila Davis, ¶ 56.**

37. Plaintiff believes she was given this directive because Roberts was desirous of intentionally underreporting the work Plaintiff completed in order to falsely create a reason to justify Plaintiff's termination. **See Affidavit for Lila Davis, ¶s 51-66.**

38. Plaintiff has recited the following examples of discriminatory conduct on the part of the Defendant:  After April 4, 2000, Ms. Roberts required that Plaintiff prepare ("prep") several orders (usually 10-20) daily that were originally assigned to her by Brenda Keller to enter into the Defendant's computer system as described in paragraph 23 of Plaintiff's Affidavit.   Usually Plaintiff prepped in batches of 10 or so orders at a time and Ms. Roberts would have her prep 1-2 batches per day.

After completing the prepping, Ms. Roberts would than take each order and enter it into the system herself instead of allowing Plaintiff to complete the computer entry. The significance of this change in procedure was that once Ms. Roberts entered the order into the system, she received the credit for that entire order entry as opposed to having the work credited to Plaintiff.   This placed an unfair disadvantage to Plaintiff since prepping an order took a great deal of time and the actual steps involved in entering the order into the computer system was relatively brief work compared to prepping.  Later in May when two new temporary employees (Ms. Erin Sanchez and Ms. Jaime Leito) were hired in the customer service department, Ms. Roberts would order Plaintiff to prep orders that were originally assigned to her in the first place and then allow the temporary employees to enter the orders on the computer, which caused the two (2) temporary employees to receive credit for the work.  So in essence, Plaintiff did all of the "dirty work" and Ms. Roberts and the two (2) temporary employees received the credit for completing the last few brief steps in   completing order entries.  This practice continued until Plaintiff was terminated.  This practice did not occur with any other csr.  **See Affidavit for Lila Davis, ¶ 51.**

39.     On numerous occasions order entry assignments were first given to the Ms. Sanchez or Ms. Lieto (the two temporary employees) and Ms. Roberts would then order Ms. Davis to assist them as part of their training.  This impromptu training occurred several times each week when they first started and continued until they were fully trained.   **See Exhibits 22a-22b (see handwritten notations at bottom of page 22a); 23a-23b (see handwritten notation at top left side of page 23a); 24a-24d (this order was originally assigned to Ms. Lieto, one of the two temporary employees, see top middle of page 24a for her initials "JT 6- 12;" the order was then reassigned to Plaintiff and she had it re-stamped by Ms. Keller to reflect that she did not receive it until June 16, 2000, *4 days later*); Exhibits 25a-25e (this order was given to a temporary employee who remained employed by Defendant a very short period of**

time; her initials were A.V.  A.V. entered the order on June 7, 2000 with a
mistake.  Plaintiff had to follow-up and correct A.V.'s mistake; notes
reflecting these occurrences are found at bottom, right side of page 25a)

40.  Another practice that Ms. Roberts instituted was that Plaintiff was required to fax
written confirmation that orders had been received to customers not only for the
orders entered by Plaintiff, but also for orders entered by other csrs. This
practice did not occur with any other csr.  **See Affidavit for Lila Davis, ¶ 53.**

41.  Ms. Roberts also required Plaintiff to prepare packages with replacement
products to be forwarded to customers in response to complaint letters.  This was
a responsibility that had heretofore been part of Brenda Keller's clerical duties.
When Ms. Keller was too busy to prepare these packages, she would enlist the
aid of Brenda Smorto and Jeanette Hirsch (clerical/secretarial employees) to
complete the work.  On occasion when Ms. Keller's backlog was extremely high,
the csr's would be permitted to prepare these packages as *overtime work*.
However, after Ms. Roberts became the supervisor, Plaintiff was required to
prepare these packages during her regular work hours (as opposed to overtime
work).   Exhibits 5a-5n consist of photocopies of customers' address labels
reflecting the customers Plaintiff prepared packages for on the dates indicated
next to each mailing address in handwriting.  When compared to the time records
attached as Exhibits 6a-6c, one can see that while Diane Saksa earned overtime
pay in May and June for mailing the consumer packages, Plaintiff did not earn
overtime pay for doing the same work. This added responsibility was assigned to
Plaintiff only and was not required of the other csrs. This additional assignment
cost Plaintiff anywhere between fifteen (15) minutes to two (2) hours per day.
**See Affidavit for Lila Davis, ¶ 54; Exhibits 5a-5n, Photocopies of Customer
Address Labels for Packages Mailed; Exhibits 6a-c, Defendant's Time
Records showing  overtime hours paid to csrs.**

42.  Ms. Roberts required that I provide telephone coverage for all csrs and the two
temporary employees for several hours, two (2) or three (3) days per week for

the entire month of June of 2000. Because I was covering six (6) lines, I had no very little time complete the order entry assignments given to me. I was not credited for answering all of these telephones calls because I could not keep my telephone log updated with the high volume of telephone calls I was answering at the time. On the days that this added assignment was given to me I lost an additional thirty (30) to ninety (90) minutes. No other csr was required to cover the telephones as I was. **See Affidavit for Lila Davis, ¶55; Exhibits 7a-7h, Photocopies of Messages redistributed to Plaintiff.**

43.    For a three (3) week period (late April- early May), I served as back up for Sandy Landro, who was assigned EDI accounts. Ms. Landro, who had unsuccessfully applied for the supervisor position when Ms. DeZenzio resigned, was job hunting and was using her vacation/personal time for a series of interviews she arranged. However, before she was able to accept any outside offers, she was offered a promotion within the Defendant's organization and she accepted the offer. During the period of time when she was interviewing, I processed her EDI accounts, which were computer generated orders generally assigned to Ms. Landro. I was never credited for completing these order entry assignments. Had I been properly credited for these orders, it would have significantly increased the number of order credited to me. These occurrences were specially reserved for me and no other csr was treated as I was. **See Affidavit for Lila Davis, ¶56; See Exhibit 20a-20c; which are a list of some EDI orders Plaintiff completed but received no credit for.**

44.    In May and June, Ms. Roberts ordered me to begin to amend orders or answer customer inquiries relating to orders that had been entered by other csrs or the two temporary employees. Prior to this, when a csr entered an order into the computer system, she was responsible for any amendments or follow up inquiries thereto. (See paragraphs 26-27.) However, Ms. Roberts was now requiring that I not only complete inquiries relating to order entries I completed, but that I cover other csr's subsequent inquiries. This additional time consuming

work did not serve as a credit to increase my daily quota and more importantly freed my fellow csrs (and temporary counterparts) to have more time off the telephones to complete their order entry work and maintain their high production numbers.   No other csr was required to handle follow up inquiries or make amendments on orders that she did not originally process. **See Affidavit for Lila Davis, ¶57.**

45.    As has been described above, Brenda Keller would distribute customer orders to the csrs.   Before distributing the orders she would date stamp the order. However, orders were redistributed per Ms. Roberts on a daily basis and were redirected to Plaintiff to process. This redistribution of work  commenced in May, occurring several times per week. By June this was a daily occurrence. These orders would have already been placed by Ms. Keller with another csr for entry and would have likely been on the csr's desk for 1-2 (or more) days before Ms. Roberts would direct that the order be redistributed to Plaintiff.  Plaintiff tried to document this occurrence by asking Ms. Keller to re-stamp the orders to reflect the date that she actually received the redistributed. Plaintiff also made computer entries in the comments section on the fourth screen. Eventually, Ms. Roberts ordered Plaintiff to stop documenting this information on the comments screen.   The significance of receiving redistributed work was that Plaintiff was blamed for allegedly creating a backlog of order entries when in fact, some of the orders that were part of my so-called backlog were the redistributed orders described above. She had no control over the  untimely handling of redistributed orders which were already part of another csr's backlog.  **See Affidavit for Lila Davis, ¶58; Exhibits 8a-8j, Orders where Plaintiff documented that they were "redistributed" to her by typing in comments section on the fourth screen; Exhibits 9a-9b Plaintiff's assigned orders delayed because of work needed to be performed by Laura Novak; Exhibits 10a-10i Orders where Plaintiff documented that they were "redistributed" by making handwritten entries.**

46.     The csrs were ordered by Ms. Roberts to record a summary of every incoming and outgoing telephone call, the duration of each telephone call and the number of orders processed on a computer generated spreadsheet. Plaintiff taught Diane Saksa how to record summaries of telephone calls on an earlier version of the spreadsheet used by csrs before Ms. DeZenzio resigned. Notwithstanding Ms. Roberts' orders that csrs continue to use an updated version of the spreadsheet, all of the csrs were permitted to stop using the spreadsheet to document their calls and orders with the exception of Plaintiff. Ms. Roberts demanded that she continue to document my incoming and outgoing telephone calls and orders. This extra work took approximately thirty to forty five (30-45) minutes per day to complete, if not longer. **See Affidavit for Lila Davis, ¶59; Exhibits 11a-11e, Plaintiff's daily reports for May and June; Exhibits 12a-12d, Diane Saksa's daily reports for May and June; Exhibits 13a-13d, Herta Page's daily reports for May and June.**

47.     On April 26, 2000, Ms. Roberts approached Plaintiff's desk and while sifting through her personal belongings, saw pills in a small colored plastic container. She demanded that Plaintiff tell her if the pills were medication prescribed to her by a doctor. Plaintiff repeatedly refused to answer the question even though she repeated the question at least three times, with the volume of her voice increasing significantly every time she repeated the question. She was so loud until at one point Ms. Jennings asked her to lower her voice because she could not hear the caller on the other line of a telephone call she was handling. Ms. Roberts did not inspect the desks of or go through the belongings of Plaintiff's co-workers. Nor did she make similar demands for the personal medical information of Plaintiff's co-workers. This type of harassment was reserved for Plaintiff alone. **See Affidavit for Lila Davis, ¶60.**

48.     On May 30, 2000, Brenda Keller and Plaintiff arrived at the entrance to the Defendant's work site at approximately 8:29 a.m. Plaintiff arrived at her desk by 8:31 a.m. They were both one (1) minute late. Plaintiff was verbally

reprimanded by Ms. Roberts, but Ms. Keller was not approached at all nor was her tardiness addressed by Ms. Roberts or anyone else. After Plaintiff was reprimanded, she later saw Ms. Keller and asked her if Ms. Roberts had approached her about being late. She said no. Plaintiff proceeded to tell her that Ms. Roberts had reprimanded for being one minute late. Ms. Keller expressed her surprise upon hearing this and later went to Ms. Roberts to explain that they were not tardy. Ms. Roberts subsequently accosted Plaintiff in her office. She was yelling and very angry with Plaintiff and told her that she had no business discussing *her* personnel related matter with her coworker (Ms. Keller). Plaintiff was greatly humiliated and in shock as a result of Ms. Roberts' unprofessional display. While both Ms. Keller and Plaintiff walked into work side by side that day, Plaintiff was the only one who was reprimanded for being one (1) minute tardy. **See Affidavit for Lila Davis, ¶61.**

49.    There were certain order forms labeled "Open Stock" that were filled out for customers that called their orders into the Defendant. The "Open Stock" order forms were filled out by the Defendant's salespeople. Due to the size and quality of the print, as well as the fact that the forms were forwarded to the customer service department by fax after being photocopied on smaller pages, these forms were impossible to read even with perfect vision. Prior to Ms. DeZenzio's departure in March of 2000, she made a point of distributing these forms in an even handed manner so that no one csr was inundated more so than her counterparts with having to process orders printed on these forms. However, when Ms. Roberts commenced employment, she gave these forms to me exclusively. When Plaintiff asked her why she was the only being given these forms, Ms. Roberts replied that Plaintiff would just have to handle it, the work must be done. No other csr was required to read and process these forms but Plaintiff. Needless to say, they were time consuming beyond normal, because Plaintiff would have to photocopy and enlarge each one of these forms. **See Affidavit for Lila Davis, ¶62.**

50.    Plaintiff performed order entry work that was labeled "Camex". Although Plaintiff performed the work, she was specifically ordered by Ms. Roberts not to log this work as having been completed by her. **See Exhibit 21a-21f which consists of some of the Camex orders completed by Plaintiff that she was not credited for.**

51.    Plaintiff's work product and conduct was scrutinized much more severely than that of her coworkers. Moreover, the Defendant utilized a double standard for evaluating her work as compared to that of her similarly situated coworkers. Plaintiff's work load at least doubled after Ms. Roberts was hired, yet she was expected to keep up with her normal workload and the new assignments given her without having any extra time to complete the additional work. In addition, Plaintiff had to spend extra time, reporting to Ms. Roberts twice per day what work she had accomplished on an hourly and even minute by minute basis. **See Affidavit for Lila Davis, ¶63.**

52.    The discriminatory treatment Plaintiff was subjected to at the hands of Ms. Roberts was unwarranted and was ultimately motivated by Ms. Roberts' contempt for her race and color. **See Affidavit for Lila Davis, ¶64.**

53.    Plaintiff's termination was based on her race and color. Her termination was not based on the fact that her work was unsatisfactory. Any assertions to the contrary are pretextual cover ups for the Defendant's discriminatory animus. The Defendant and its' agents were fully aware that Plaintiff was being treated differently than her similarly situated coworkers in terms of the quantity and quality work assigned to her. The Defendants were also aware that her work product and conduct were being subjected to a much harsher review than that of her similarly situated counterparts. **See Affidavit for Lila Davis, ¶65.**

54.    Mr. Ferrara held African Americans in very low esteem simply because they were of a certain race and color and treated Plaintiff with low contempt while on the job. **See Affidavit for Lila Davis, ¶66.**

55.    After Ms. Roberts was hired on April 3, 2000, and began to harass Plaintiff over the pretextual quotas Plaintiff questioned and polled each of her coworkers sometime in late May of 2000, including (Ms. Baldino, Ms. Saksa and Ms. Landro). Plaintiff specifically asked each of them if Ms. Roberts told them there was a quota (concerning the number of orders or other work assignments that they had to complete each day). Each of three (3) women responded that they had not been made aware of any such quota. Plaintiff also asked Ms. McCausland, (who had been demoted from the same supervisory position which Ms. Roberts occupied in June of 1999, after the incident with Ms. Jennings) if there had ever been a quota for csrs. She answered in the negative, telling Plaintiff that because every day is different quotas were not possible to enforce. **See Affidavit for Lila Davis, ¶67.**

56.    Ms. Page, (a fellow csr) was either promoted or laterally transferred to a new position in another department approximately two (2) weeks before Plaintiff was terminated. Before her promotion/transfer went into effect, Ms. Page had managed to accumulate a significant backlog of orders. Instead of completing the orders, however, she simply deleted the orders on June 7, 2000, at 10:50 a.m., from the computer system, costing the Defendant $37,038.12 in income. She did not have permission to delete the orders. Another coworker who was concerned about the discriminatory treatment Plaintiff was being subjected to notified Plaintiff what Ms. Page had done. This co-worker also told Plaintiff that she did not understand why Plaintiff _alone_ was being treated so harshly by Ms. Roberts when Ms. Page and the other csrs as well, had frequent and current problematic backlogs, just like the Plaintiff which she was personally aware were being _ignored_ by Ms. Roberts and Mr. Ferrara. **See Affidavit for Lila Davis, ¶67; See Exhibit 14a-14q, A list of the actual orders deleted by Ms. Herta Page on June 7, 2000, along with a note written by Ms. Roberts to Ms. Page requesting that she show Erin Sanchez how to take the backlogged orders off of hold status.**

57. By way of example Exhibit 19 consists of an order, part of which Ms. Page took the liberty of canceling. Ms. Davis had to correct Ms. Page's mistake by reordering the portion that had been cancelled by Ms. Page. This is a clear example of Plaintiff being required to clean up errors committed by other csrs, even though the error was not her own. Plaintiff documented Ms. Page's error that she corrected on Exhibit pages 19d, 19g. **See Exhibit 19a-19g.**

58. By way of another example of Plaintiff cleaning up another co-worker's mess, Ms. Page was given an order to enter on June 14, 2000 and the salesperson "Wayne" noted that the order needed to be rushed. However, due to Ms. Page's backlog, Ms. Keller reassigned the order to Plaintiff on June 15, 2000 to complete. Plaintiff made a hand written notation on far right side of page 26a to reflect that she did not receive it until 6/15 (mistakenly written as 3/15) at 3:45 p.m. **See Exhibit 26a-26b.**

59. On a regular weekly basis, Plaintiff was given many orders that had been sitting for several days without being assigned to anyone at all. Many of the backlog orders that Defendant claims Plaintiff was responsible for creating were in fact orders that sat for several days without being assigned to anyone and then were handed off to Plaintiff only to have her falsely accused of being responsible for delaying the entry of the order. **See Exhibits 27a-27h (order which was received by Defendant on June 5, 2000 but was not assigned to Plaintiff until June 6, 2000 which she documented by having the order restamped and by making a handwritten notation); See Exhibits 28a-28c (order received by Defendant on June 22, 2000, but not assigned to Plaintiff until June 29, 2000); Exhibits 29, (order received by Defendant on June 23, 2000, but not assigned to Plaintiff until June 29, 2000); Exhibit 30 (order received by Defendant June 27, 2000 but not assigned to Plaintiff until June 29, 2000, Exhibit 31a-31b (order date stamped as being received on May 22, 2000 and was assigned to Diane Saksa then reassigned to Plaintiff on May 30, 2000-see Plaintiff's handwritten at top center of page 31a-"DS" for**

**Diane Saksa and "LD 5/30" as well as mechanical stamp at bottom left side of page);**

60. The Defendant falsely accused Plaintiff of stealing documents from the Defendant's facility. These allegations are based on excerpts of testimony given by Plaintiff during her deposition on January 22, 2004. However, Defendant has never had a policy in place whatsoever regarding removal of documents from its facility. Plaintiff never had access to any trade/manufacturing secrets, formulas, personnel files or any similarly confidential and sensitive information. Several questions were asked of Plaintiff pertaining to whether she stole in excess of 4,000 pages of documents from the Defendant's facility before being terminated. Due to the length of the deposition (approximately 9 hours) and her misunderstanding of the law, as well as the defense attorney's badgering mannerisms, she later came to believe that the testimony she gave was inaccurate. The 4,000 documents submitted by Plaintiff to Defendant as part of her 26(a) disclosures included many documents which *were not* generated by the Defendants or were part of Plaintiff's personal records. In fact, defendant cannot state any legitimate basis for making this accusation such as making reference to a specific policy that Plaintiff was made aware of prohibiting her from removing records from Defendant's facility. Moreover, Plaintiff testified in her jurat that on the day she was terminated her supervisor, Ms. Roberts escorted her back and forth from her desk to her automobile as Plaintiff removed at least four (4) big boxes of documents from Defendant's facility. Ms. Roberts never questioned Plaintiff as to what was in the contents of the boxes. Plaintiff submitted a jurat to correct her testimony regarding the allegations made by the Defendants within thirty (30) days after the deposition took place. **See Affidavit for Lila Davis, ¶69; Exhibit 15a-15aa, Employee Handbook which reflects that there was no policy on removal of documents from Defendant's workplace; Exhibit 16a-h; Entire jurat submitted by Plaintiff to supplement her January 22, 2004 deposition testimony.**

THE PLAINTIFF

BY _____

MAX F. BRUNSWICK
Her Attorney
12 Trumbull Street
New Haven, CT 06511
(203) 562-4024
FAX: (203) 782-5979
Fed. Bar No.5918

## CERTIFICATION

A copy of the foregoing statement was sent by U.S. mail, first class, on August 16, 2004 to the following:

        Alison Jacobs Wice, Esq.
        Jackson Lewis, LLP
        177 Broad Street
        Stamford, CT 06904

_____

MAX F. BRUNSWICK