FILED

**UNITED STATES DISTRICT COURT**    2004 AUG 19 P 1: 56
**DISTRICT OF CONNECTICUT**

U.S. DISTRICT COURT

| | |
|---|---|
| Lila R. Davis, | : NO. 3:01 CV 2204 (DJS) T. |
| Plaintiff | : |
| | : Jury Trial Demanded |
| Pilot Corporation of America, | : August 16, 2004 |
| Defendant | : |

## AFFIDAVIT FOR LILA DAVIS

Personally appeared Lila R. Davis, who being duly sworn, deposes and says:

1.    I am over the age of eighteen and believe in the obligation of an oath.

2.    I am an African American woman and citizen of the United States.

3.    During the time I was employed by the Defendant, I maintained a journal into which I made daily entries of occurrences that took place on the job.

4.    The entries were detailed, but by no means did I purport to record a complete exhaustive list of the daily occurrences or the work that I completed in the Defendant's workplace.  That would not have been physically possible as our days were generally always busy and were probably far too busy for me to make such detailed records.

5.    However, I did attempt, in my daily journal, to write down as accurately as possible the daily occurrences and work I performed on the job in as much detail *as time would permit.*

6.    The Defendant through Laurie Faulkner, offered me permanent full time employment in writing, on August 4, 1999, and took effect on August 17, 1999.

7.    Before I was employed as a full time permanent employee, I was initially hired by the Defendant as a temporary employee in June of 1999.

8.    At that time (June) my application, which had originally been submitted for review in March/April of 1999, was initially reviewed by Chantay Bynes, a Human Resources employee.

9.    She scheduled an interview with me in early June.  On the same day, I was next interviewed by John Ferrara.

10.   Several days later, I was interviewed a third time by Donna McCausland.  At the conclusion of the interview, she told me that she would recommend to Human Resources that I should be hired to fill the position.  I understood that she had the final authority to make the decision on whether I should be hired.

11.   The next day, I heard from Chantay Bynes who verbally made an offer of employment via telephone conversation.  During this conversation, she indicated that the Defendant was not interested in employing me as a full time permanent employee.   Rather, the Defendant preferred that I now present myself to an employment agency so that I could be hired as a temporary employee for a period of six months.  After six (6) months, if my performance was satisfactory, Ms. Bynes told me that I would be hired as a permanent employee by the Defendant. Ms. Bynes then directed that I present myself to McIntyre Associates in Shelton, who had been notified of the arrangement.   After I completed paperwork at the McIntyre Associates' office, I was employed as a temporary employee from June 14, 1999 until August 17, 1999.

12.   At the same time that I was hired as a temporary employee in June of 1999, Judith DeZenzio was also hired to replace the recently demoted, Ms. McCausland.  However, Ms. Bynes told me that my starting date would occur one week *after* Ms. DeZenzio started in order to give her a week to become acquainted with her new position.  Ms. Bynes stated that it would not be fair to the department or Ms. DeZenzio to have to deal with a new employee at the same time she is handling her new responsibilities.

13.   Ms. McCausland, until just several weeks immediately before my application was reviewed in early June, had been the immediate supervisor (and Ms. DeZenzio's predecessor) of the customer service department.  However, she had recently been demoted after having a racially charged confrontation with Wendy Jennings, the only other African American (besides myself) employed in the

customer service department, regarding the subject of Kwanzaa. I did not know this at the time that my June interviews took place, but learned this several weeks later.

14.   After I became employed by the Defendant, I also learned from Ms. Jennings that not only had she been subjected to racially offensive remarks by Ms. McCausland, but recently, Mr. Ferrara had also repeatedly used the word "nigger" in conversation with Ms. Jennings to describe African Americans residing in Bridgeport. When she took offense to his comments, he became even more adamant and offensive in his tone. After she registered several complaints, she was offered a 10% raise (an approximation) as a monetary settlement.

15.   However, Ms. Jennings had another pressing and substantive issue, the fact that she was repeatedly denied a promotion to a csr position. The Defendant only promoted her to a csr position after I was terminated and filed a complaint alleging that my termination was based on racially discriminatory motivations.

16.   I was fully qualified to handle the csr responsibilities as I have an extensive professional background in long term administrative assistant and research and development support positions for medium to large sized corporate entities. I have also taken and successfully passed dozens of college and business school courses.

17.   Judith DeZenzio was my immediate supervisor from the time I was hired first as a temporary employee and then continuing after my promotion as a full time customer service representative, in August of 1999, until she resigned in March of 2000.

18.   Even though the Defendants wanted me to work as a temporary employee for six (6) months, I was hired as a permanent full time employee less than eight (8) weeks later. Ms. DeZenzio notified me verbally of the Defendant's intention to make a permanent full time offer of employment based on my exemplary work performance. The written offer of employment was made by Laurie Faulkner, the

Human Resources Director. John Ferrara never made any offer of employment to me directly, nor did he discuss any offer of employment with me *at any time*.

19. I immediately noticed Mr. Ferrara's cold demeanor once I started working for the Defendant. Once I was made aware by Ms. Jennings of the recent racially charged occurrences/conversations, I understood the nature of his behavior and took note of the fact that he had problems relating socially to African Americans. I "bent over backwards" in an attempt to avoid causing any problem that would incur his disfavor.

20. On my first day at work as a temporary employee, Mr. Ferrara gave me a guided tour of the Defendant's facilities. Ms. Jennings was absent because she was on vacation. He informed me that Ms. Jennings was the only person in the department that he had not introduced me to because she was on vacation but once I met her, he was certain that I would like her and we would get along. At first I took this to mean simply that she was a nice person. Later, when I met her and discovered she was African American (and the only other African American employed in the customer service department) and learned of the recent racially charged incidents, I had a different understanding of his remarks. I concluded that he believed we would "get along" and that I would like her *just because* she was an African American.

21. As time passed, Mr. Ferrara expressed his displeasure with our socializing together (Ms. Jennings and I). At first we became close and talked daily and ate lunch together. He told me specifically that he was concerned that I would become unduly influenced by Ms. Jennings and her opinion about occurrences in the department that took place before I was hired. I understood that his references concerned the racially charged conversations he had with Ms. Jennings and concluded that he did not want me to befriend Ms. Jennings who he considered to be a troublemaker because she complained about his inappropriate remarks to her. I was also clear that he felt inappropriately

uncomfortable with African Americans having any type of relationships in his department in general.

22. I found Ms. DeZenzio to be an especially open and genuinely good natured person and I appreciated her presence as my supervisor. Especially after learning of the recent racially charged conversations and occurrences involving Ms. Jennings, I felt even more comfortable with Ms. DeZenzio who like me was an outsider.

23. My responsibilities as a csr included the following:

Entering customers' orders for the defendant's products (writing implements, related accessories and ink) into the defendant's computer system. This process involved the following 18 steps to prepare ("prep") each order to be entered into the computer system:

(1) the customer sends an order form (via facsimile or email) which is distributed to csrs by Brenda Keller, my former co-worker;

(2) Some customers requested confirmation either verbally or via email that the order had been received;

(3) As a csr I would check to make sure the order form has a date stamp (indicating the date the order was actually received by the Defendant);

(4) If the date stamp was missing I would normally request that Ms. Keller stamp the order with the receipt date although this was frequently not done in a timely manner, with the result that the date stamped on a particular order did not accurately reflect the actual date that the document was received by the Defendant;

(5) I would then check the "sold to" (billing) and "ship to" (mailing) address categories to make certain that they are actually typed on the order form and that both addresses have already been entered into the computer system;

(6) If the two addresses were not on the order form then I had to telephone the customer and ask the customer to resubmit the order form with the address information completed;

(7) If the address information listed on the order form had not been entered into the computer system, I would write in the missing address information on a "Telephone Inquiry Form" and forward it to Laura Novak (a coworker employed in another department) who was responsible for arranging to have the information entered into the system.  Until the address information was entered into the system by Ms. Novak, the subject order could not be completed.  This particular portion of the process was a frequent problem for me as a csr processing orders for new customers.  Ms. Novak was regularly delayed in entering the address information into the system which in turn caused a delay as far as completing my daily order entry assignments on a timely basis.

(8) I would then check the order form to make sure the purchase order number (p.o.) was listed.

(9) If the p.o. number is not on the order form, I would telephone the customer and to obtain the p.o. number.

(10)  I would then count the total number of lines in the order, with each line representing a different products being ordered.

(11) I would also change listings under the "Quantity" heading on the order form reading "dozen" to read "each" because of a system wide shortcoming.

(12) I would then total the quantity of items being ordered.

(13) I would then total the number of lines in the order.

(14) I would then total the prices for each item ordered.

(15) As I would engage in checking the total price for each specific line item, I would also check the "item number" entry on each line to be certain that it matched the entry under the "item description."

(16) If the item number did not match the item description I would telephone the customer to determine which item the customer wanted included in the order;

(17) If any order form contained a duplicate line, I would telephone the customer to make certain that the duplicated entry was not an error.

(18) I would go into the computer system to the look up the customer's pre-assigned account number and then record that number on the order form.

Prepping an order could take anywhere from 5-20 minutes. The time involved varied depending upon the number of products included in the order, whether all necessary data was supplied by the customer on the order form, and whether any information needed from Novak was provided in a timely fashion.

24.    After prepping each order I would take the following steps to enter each order into the computer system:

(1) On the first screen, I entered instructions for the delivery driver and the delivery date;

(2) On the second screen I entered the customer's account number, p.o. number and "ship to" address; the csr also verifies the billing address;

(3) On the third screen I would enter the quantity and item no. for the products ordered;

(4) On the fourth screen I would enter miscellaneous/notes comments. After proofreading the data entered, I completed the order by hitting the "enter" button.

25.    Some customers required confirmation via email or facsimile once the order was completed.

26.    Frequently (on a daily basis), orders were put on hold for any of the following reasons:

(1) one of the items ordered was being discontinued;

(2) a new product was not yet available in the U.S. for purchase;

(3) the order had to be split between different warehouses (Florida, California and/or Connecticut);

(4) Ferraro required that orders over a certain dollar amount had to be approved by him personally;

(5) a customer had previous orders that needed to be paid before new orders could be entered into the system.

Orders could be on hold for several hours, days or weeks and resolution of any of the five issues listed above was generally beyond my control as a csr. Placing orders on hold would cause me to fall behind in timely completing my daily quota of order entries.

27.    Once I entered each order into the computer system, I was responsible for answering corresponding follow up inquiries from any customer whose order I had actually entered into the system. Answering customers' follow up inquiries was a tedious and extremely time consuming part of my csr responsibilities that performing research, making additional time consuming telephone calls to seek the whereabouts of a particular order, or information concerning the availability of a particular product. Oftentimes, answering any particular inquiry could involve spending anywhere from 15 minutes to two (2) hours tracking down the sought after information.

28.    I was also responsible for responding to a myriad of issues raised by customers and employees alike including complaints about malfunctioning pens, questions regarding new products, suggestions, requests for chartable donations, and amending or adding to orders. Responding to issues raised often required further research and additional telephone calling.

29.    I also completed address labels for packages mailed to customers which contained sample orders of products. They were mailed to customers who complained about purchasing defective products, or stated that they could not find a particular product or a particular style/color of a product.

30.  I was responsible for mailing fact sheets which described the ingredients/chemical make up of a product (especially where product had been chewed by an animal).

31.  Customers requested information concerning ink removal and I would mail a courtesy sample of "oops" a product used to remove most types of ink.

32.  I traced Federal Express and U.P.S. deliveries when customers complained about not receiving orders.

33.  I filled out forms for a variety of issues including:

    1.  "Return Goods Authorization" for items returned by customers;

    2.  "Internal Adjustments" and "External Adjustments" to adjust a customer's bill after returning an item;

    3.  Federal express/ups mailing forms;

    4.  "Telephone Log" for recording the nature of all incoming and outgoing calls and the duration of each call;

34.  My performance was initially evaluated in late November of 1999.  I received the attached performance review with a heading that reads "Lila Davis Employee Status (90) day."

35.  At the time I received the evaluation, I had an opportunity to discuss the contents of my evaluation with my immediate supervisor, Ms. DeZenzio.

36.  At that time, she explained that my performance was satisfactory and she expressed her confidence that as time passed, she expected me to continue to work at mastering the basic responsibilities that I had learned over the last three (3) months and increase my capacities.

37.  During the entire period of time that I was under Ms. DeZenzio's supervision, neither she nor Mr. Ferrara ever advised me that I was expected to keep up with a quota (i.e. complete a certain number of telephone calls and order entries on a daily basis).

38.  During the entire period of time that I was under Ms. DeZenzio's supervision, neither she nor Mr. Ferrara ever advised me that my performance was unsatisfactory in any respect.

39.  When we discussed my evaluation, Ms. DeZenzio explained that she would arrange for me to have my training completed.  Until that point in time, my training had been sporadic and disorganized and had not yet been completed.

40.  When I began as a temporary employee in June of 1999, I found the department to be operating in a disorderly and chaotic manner with the recent personnel changes.  Donna McCausland had been demoted for her inappropriate comments to Ms. Jennings.  Both Ms. DeZenzio and I were brand new employees hired in June and in need of training and orientation.

41.  I had to rely on a deficient training process.  Instead of having one organized formal training session, I was provided multiple piecemeal training sessions that began when I was first hired as a temporary employee in June and were spread out in a disorganized fashion continuing into December of 1999.

42.  The major reason that my training was carried out in a piecemeal manner was that when I was hired in June of 1999, there was no one who was prepared to train me who was actually knowledgeable enough about the job.  Ms. McCausland, the last supervisor preceding Ms. DeZenzio, was still smarting from her demotion and I presume, was not a likely or fit person to train me.

43.  My current supervisor, Ms. DeZenzio could not train me while she was still learning the job.  Therefore, I was given over to Mr. Ferrara who provided my orientation and Diane Saksa and Sandy Landro, fellow csrs, who sporadically trained me.

44.  Mr. Ferrara provided a portion of orientation to me during my first week as a temporary employee. After I became a full time, permanent employee I reminded Ms. DeZenzio that I had not been fully trained nor had my orientation been completed.  Ms. DeZenzio approached Mr. Ferrara and arranged for him to complete my orientation which took place in the late fall of 1999.

45.  Ms. Saksa provided several hours of training for me in June on general order entry work. She resumed training me on September 13, 1999, in handling international orders. Sandy Landro provided several hours of training for me in December of 1999 to handle EDI accounts, a special ordering procedure.

46.  The nature of work in the customer service department involved periods of peaks and valleys in customer sales. Generally, even during the slower periods during the year, business seemed to be brisk and we always had measure of work to do that kept us fairly busy. However, during certain seasons, sales peaked for long periods of time and due to the increased volume of customer orders, all of my fellow csrs would more prone than normal to falling behind in completing their order entry assignments.

47.  Under the supervision of Ms. DeZenzio, she did not become overly alarmed during these periods of increased sales volume. This is not to say that she did not react at all, but rather she would calmly handle the overflow of work without becoming emotionally charged over the fact that *all* of the csrs were falling behind in completing their order entries for long periods of time.

48.  Ms. DeZenzio would usually take steps such as allowing us to work overtime, or half hour lunches. Her more frequent response during these periods of increased sales volume would be to have csrs who were momentarily caught up with their order entry work or not as far behind provide assistance to other csrs who was further behind.

49.  In March of 2000, Ms. DeZenzio resigned and the department was again without a supervisor. Mr. Ferrara took on the supervisory role in addition to his role as manager until Patricia Roberts was hired and commenced as supervisor on April 3, 2000.

50.  On the first day I met Ms. Roberts, April 4, 2000, she sat with me at my work station for approximately ninety (90) minutes and requested that I demonstrate how I performed my responsibilities. After I completed this assignment, she told

me that I had done a good job explaining my work to her and that I was a good teacher.

51.    After April 4, 2000, Ms. Roberts began to change my work routine in such a manner that while I continued to perform the same work responsibilities, I was not credited for all of the work I did.    In addition, she added to my daily responsibilities, again without giving me proper credit for the additional work I did.

52.    By way of example of she increased my work and refused to credit me for the extra work I performed, I recite the following illustrations: After April 4, 2000, Ms. Roberts required that I prepare ("prep") several orders (usually 10-20) daily that were originally assigned to me by Brenda Keller to enter into the Defendant's computer system as described in paragraph 23 above.    Usually I prepped in batches of 10 or so orders at a time and Ms. Roberts would have me prep 1-2 batches per day.    After completing the prepping, Ms. Roberts would than take the order and enter it into the system herself instead of allowing me to complete the computer entry. The significance of this change in procedure was that once she entered the order into the system, she received the credit for that entire order entry as opposed to having the work credited to me.    This placed an unfair disadvantage to me since prepping an order took a great deal of time and the actual time involved in entering the order into the computer system was relatively brief work compared to prepping.    Later in May, when two (2) new temporary employees were hired in the customer service department, Ms. Roberts would order me to prep orders that were originally assigned to me and then allow the temporary employees to enter the orders on the computer, which caused the two (2) temporary employees to receive credit for the work.    Their names are Erin Sanchez and Jaime Leito.    So in essence, I did all of the "dirty work" and Ms. Roberts, Ms. Sanchez and/or Ms. Leito received the credit after completing the last few brief steps in completing order entries.    This practice continued until I was terminated.    This practice did not occur with any other csr.

53.  Another practice that Ms. Roberts instituted was that I was required to fax written confirmation that orders had been received to customers not only for my own orders, but also for orders entered by other csrs.  This practice did not occur with any other csr.

54.  Ms. Roberts also required that I prepare packages with replacement products to be forwarded to customers in response to their complaint letters.  This was a responsibility that had heretofore been part of Brenda Keller's clerical duties. When Ms. Keller was too busy to prepare these packages, she would enlist the aid of Brenda Smorto and Jeanette Hirsch (clerical/secretarial employees) to complete the work.  On occasion when Ms. Keller's backlog was extremely high, the csr's would be permitted to prepare these packages as *overtime work*. However, after Ms. Roberts became our supervisor, I was required to prepare these packages during my regular work hours (as opposed to overtime work). This added responsibility was assigned to me only and was not required of the other csrs.  This additional assignment cost me anywhere between fifteen (15) minutes to two (2) hours per day.

55.  Ms. Roberts required that I provide telephone coverage for all csrs and the two temporary employees for several hours, two (2) or three (3) days per week for the entire month of June of 2000.  Because I was covering six (6) lines, I had no very little time complete the order entry assignments given to me.  I was not credited for answering all of these telephones calls because I could not keep my telephone log updated with the high volume of telephone calls I was answering at the time.  On the days that this added assignment was given to me I lost an additional thirty (30) to ninety (90) minutes.  No other csr was required to cover the telephones as I was.

56.  For a three (3) week period (April-May), I served as back up for Sandy Landro, who was assigned EDI accounts.  Ms. Landro, who had unsuccessfully applied for the supervisor position when Ms. DeZenzio resigned, was job hunting at the time and was using her vacation/personal time for a series of interviews she

arranged.  However, before she was able to accept any outside offers, she was offered a promotion within the Defendant's organization and she accepted the offer.  During the period of time when she was interviewing, I processed her EDI accounts, which were computer generated orders generally assigned to Ms. Landro.  I was never credited for completing these order entry assignments.  Had I been properly credited for these orders, it would have significantly increased the number of orders credited to me.  These occurrences were especially reserved for me and no other csr was treated as I was.

On at least three (3) occasions in May or June, Ms. Roberts added yet another assignment to my growing list of tasks that I was not given credit for performing.  In fact, Ms. Roberts specifically instructed me not to include the specific order numbers to a log that I handed in to Ms. Roberts on a daily basis. These orders, Camex orders were normally assigned to another csr but on several occasions, I completed the Camex orders at Ms. Roberts' directive.

57    In May and June, Ms. Roberts ordered me to begin to amend orders or answer customer inquiries relating to orders that had been entered by other csrs or the two temporary employees.   Prior to this, when a csr entered an order into the computer system, she was responsible for any amendments or follow up inquiries thereto. (See paragraphs 26-27.)  However, Ms. Roberts was now requiring that I not only complete inquiries relating to order entries I completed, but that I cover other csr's subsequent inquiries.  This additional time consuming work did not serve as a credit to increase my daily quota and more importantly freed my fellow csrs (and temporary counterparts) to have more time off the telephones to complete their order entry work and maintain their high production numbers.   No other csr was required to handle follow up inquiries or make amendments on orders that she did not originally process.

58.    The scenarios describe in paragraphs 51-57 were not the only manners that I was cheated by Ms. Roberts from being properly credited for the work I performed.  As I have described in paragraph 23 above, Brenda Keller would

distribute customer orders to the various csrs. Before distributing the orders she would date stamp the order. However, orders were redistributed per Ms. Roberts on a daily basis and were generally redirected to me to process. This redistribution of work commenced in May, occurring several times per week. By June this was a daily occurrence. These orders would have already been placed by Ms. Keller with another csr for entry and would have likely been on the csr's desk for 1-2 (or more) days before Ms. Roberts would direct that the order be redistributed to me. I tried to document this occurrence by asking Ms. Keller to re-stamp the orders to reflect the date that I actually received the redistributed. I also made computer entries in the comments section on the fourth screen (see paragraph 24). Eventually, Ms. Roberts ordered me to stop documenting this information on the comments screen. The significance of receiving redistributed work was that I was blamed for allegedly creating a backlog of order entries when in fact, some of the orders that were part of my so-called backlog were the redistributed orders described above. I had no control over the untimely handling of redistributed orders which were already part of another csr's backlog.

59.  The csrs were ordered by Ms. Roberts to record a summary of every incoming and outgoing telephone call, the duration of each telephone call and the number of orders processed on a computer generated spreadsheet. In fact, I taught Diane Saksa how to record summaries of telephone calls on an earlier version of the spreadsheet used before Ms. DeZenzio resigned. Notwithstanding Ms. Roberts' orders that we continue to use an updated version of the spreadsheet, all of the other csrs were permitted to stop using the spreadsheet to document their calls and orders. However, Ms. Roberts demanded that I continue to document my incoming and outgoing telephone calls and orders. This extra work took approximately thirty (30) to forty five (45) minutes per day to complete.

60.  On April 26, 2000, Ms. Roberts approached my desk and while sifting through my personal belongings, saw pills in a small colored plastic container. She

demanded that I tell her if the pills were medication prescribed to me by a doctor. I repeatedly refused to answer the question even though she repeated the question at least three times, with the volume of her voice increasing significantly every time she repeated the question. She was so loud until at one point Ms. Jennings asked her to lower her voice because she could not hear the caller on the other line of a telephone call she was handling. Ms. Roberts did not poke around on the desks of my other coworkers, nor did she delve into their personal medical affairs (and she was not legally entitled to access that information).

61.    On May 30, 2000, Brenda Keller and I arrived at the entrance to the Defendant's work site at approximately 8:29 a.m. I arrived at my desk by 8:31 a.m. We were both one (1) minute late. I was verbally reprimanded by Ms. Roberts, but Ms. Keller was not approached at all nor was her tardiness addressed by Ms. Roberts or anyone else. After I was reprimanded, I later saw Ms. Keller and asked her if Ms. Roberts had approached her about being late. She said no. I proceeded to tell her that Ms. Roberts had reprimanded for being one minute late. Ms. Keller expressed her surprise upon hearing this and later went to Ms. Roberts to explain that we were not tardy. Ms. Roberts subsequently accosted me in her office. She was yelling and very angry at me and told me I had no business discussing *my* personnel related matter with my coworker (Ms. Keller). I was greatly humiliated and in shock as a result of Ms. Roberts' unprofessional display. While both Ms. Keller and I walked into work side by side that day, I was the only one who was reprimanded for being one (1) minute tardy.

62.    There were certain order forms labeled "Open Stock" that were filled out for customers that called their orders into the Defendant. The "Open Stock" order forms were filled out by the Defendant's salespeople. Due to the size and quality of the print, as well as the fact that the forms were forwarded to the customer service department by fax after being photocopied on smaller pages, these forms were impossible to read even with perfect vision. Prior to Ms. DeZenzio's departure in March of 2000, she made a point of distributing these forms in an

even handed manner so that no one csr was inundated more so than her counterparts with having to process orders printed on these forms. However, when Ms. Roberts commenced employment, she gave these forms to me exclusively. When I asked her why I was the only being given these forms, she replied that I would just have to handle it, the work must be done. No other csr was required to read and process these forms but me. Needless to say, they were time consuming beyond normal, because I would have to photocopy and enlarge each one of these forms.

63. My work product and conduct was scrutinized much more severely than that of my coworkers. Moreover, the Defendant utilized a double standard for evaluating my work as compared to that of my similarly situated coworkers. My work load at least doubled after Ms. Roberts was hired (see paragraphs 52-59, 62), yet I was expected to keep up with my normal workload and the new assignments given to me without having any extra time to complete the additional work. In addition, I had to spend extra time, reporting to Ms. Roberts twice per day what work I had accomplished on an hourly and even minute by minute basis.

64. The discriminatory treatment I received at the hands of Ms. Roberts as has been detailed in paragraphs 52-63 above was unwarranted and I believe was ultimately motivated by Ms. Roberts' contempt for my race and color.

65. My termination was unfair and was based on my race and color. My termination was not based on the fact that my work was unsatisfactory. Any assertions to the contrary are pretextual cover ups for the Defendant's discriminatory animus. The Defendant and its' agents were fully aware that I was being treated differently than my similarly situated coworkers in terms of the quantity and quality work assigned to me. The Defendants were also aware that my work product and conduct were being subjected to a much harsher review than that of my counterparts.

66. Mr. Ferrara, who already had a very recent proven track record for referring to African Americans living in the Bridgeport area as niggers was only to happy to play a part in any scheme designed by Ms. Roberts to rid his department of another "nigger" such as myself. I do not classify myself as such, I am merely suggesting what I presume and believed his line of thinking to be as it concerned the discriminatory treatment I was subjected.

67. After Ms. Roberts was hired and began to harass me over the alleged quotas that she expected of me, I personally questioned and polled each of my coworkers sometime in late May, including (Ms. Baldino, Ms. Saksa and Ms. Landro). I specifically asked each of them if Ms. Roberts told them there was a quota concerning the number of order or other work assignments that they had to complete each day and they each responded that they had not been made aware of any such quota. I also asked Ms. McCausland, (who had been demoted from the same supervisory position which Ms. Roberts occupied in June of 1999, after the incident with Ms. Jennings) if there had ever been a quota for csrs. She answered in the negative, telling me that every day is different, and therefore quotas were not possible to enforce.

68. Ms. Page, (a fellow csr) was either promoted or laterally transferred to a new position in another department approximately two (2) weeks before I was terminated. Just days before her promotion/transfer went into effect, she was had accumulated a significant backlog or orders. Instead of completing the orders, she simply deleted the orders on June 7, 2000 at 10:50 a.m., from the computer system, costing the Defendant $37,038.12 in income. She did not have permission to delete the orders. Another coworker who was concerned about the discriminatory treatment I was being subjected to provided a list of the orders she deleted and told me that she did not understand why I *alone* was being treated so harshly by Ms. Roberts when Ms. Page and the other csrs as well, had frequent and current problematic backlogs, just as I did, that she was personally aware were being *ignored* by Ms. Roberts and Mr. Ferrara.

69.    The Defendant has falsely accused me of stealing documents from the Defendants facility.  Several questions were asked of me pertaining to whether I stole in excess of 4,000 pages of documents from the Defendant's facility before I was terminated.  Due the length of the deposition (approximately 9 hours) and my misunderstanding of the law, as well as the defense attorney's badgering mannerisms, I later came to believe that the testimony I gave was inaccurate. Therefore I submitted a jurat (through my attorney) to correct my testimony regarding the allegations made by the Defendants that I stole paperwork from the Defendant's facility.  I hereby reiterate the testimony I included as part of a jurat submitted to the court reporter and the court within 30 days after the deposition took place:

"JURAT

I, LILA DAVIS, do hereby certify that I have read the foregoing transcript of my testimony, taken on January 22, 2004, and have signed it subject to the following changes:

| PAGE: | LINE: | CORRECTION: | REASON: |
|---|---|---|---|
| | | "Patty Roberts told me to remove all items from my desk when I was fired on on June 29[th]. She even provided me with the boxes to pack everything that was on and in my desk. She also stood at my desk watching me and asking me if she could help me. After that she walked me to the door as I was carrying out the items.  At the very end, she asked if I had taken everything. Because I was so shocked and humiliated at being terminated  I was numb and embarrassed.  I was so hurt that I did not have the energy as I stood packing the "items" in and on my desk to think about what exactly I was doing.  Patty stood there in a hurried manner and I just wanted to pack the things on my desk and leave.  There was no conscious decision to sift through my desk and examine what I was taking.  I was simply trying to follow her instructions and leave so that I could go home and cry and find someone to talk to because I was so hurt and shocked that it had come to this." | the transcript that my answer was not accurate; |
| 154 | 1/3/6 | change the answer on each of the lines as follows: "No." | I realized upon reviewing the transcript that my answer was not accurate; |

| 154 | 8/10 | change the answer for each of the lines as follows: "I was never told that I needed to have authority to make copies. There is no policy ever issued by Pilot that I was made aware of that told us as CSRs that we could not look at or photocopy the daily reports maintained by Wendy." | I realized upon reviewing the transcript that my answer was not accurate/complete; |
| 154 | 12 | change the answer as follows: "No it is not stealing." | I realized upon reviewing the transcript that my answer was not accurate; |
| 154 | 14 | change the answer as follows: "I did not steal anything." | I realized upon reviewing the transcript that my answer was not accurate; |
| 154 | 18-19 | change the answer as follows: "I did not steal any documents." | I realized upon reviewing the transcript that my answer was not accurate; |
| 156 | 3 | add to the answer as follows: "and the documents were not stolen." | I realized upon reviewing the transcript that my answer was not accurate; |
| 159 | 13-16 | add to the answer as follows: "and the documents were not stolen." | I realized upon reviewing the transcript that my answer was not accurate; |
| 159 | 19 | change the answer as follows: "Of the 4100 documents submitted as 26(a) disclosures none of them were stolen, nor were all of them Pilot generated documents; in fact I have turned over 58 categories of documents to my first attorney, Rebecca Johnson and I updated some of my submissions when Mr. Max Brunswick took over representing me. The 58 categories are as listed below. The categories that are underlined are documents either I personally or third parties generated *outside of any job related requirement*. The categories that are bolded are documents that were given to me by the defendant to keep as part of my personnel related records or else were given to me for training-orientation purposes. The remaining documents listed in categories 22-25 were emails that I had direct access to. The documents listed in categories 28 and 31-43 were records of the work that was specifically assigned to me while I was employed by the defendant. The documents listed in categories 29, 47, 52, 53 and 58 were documents that any body could have had access to as long as they knew of their existence (which I believe everyone did). These records were maintained by Wendy Jennings, a clerical employee. They were not kept under lock and key and there was never any | I realized upon reviewing the transcript that my answer was not accurate; |

policy that was written by the defendant to say that
we could not have access to these records.:

1. Pilot Corporation of America Employee Handbook; 26 pages
2. CCHRO/EEOC complaint and attachments; 61 pages
3. EEOC Notice of Right to Sue; 2 pages
4. Plaintiff's resume; 1 page
5. Memo re: security card dated 6/17/99; 2 pages
6. Memo re: gate security card reader dated 5/29/97; 1 page
7. Defendant's offer of employment letter to Plaintiff dated 8/4/99; 1 page
8. Defendant's benefit fact sheet; 2 pages
9. Note to Lila Davis File dated 8/5/99 and 8/6/99; 3 pages
10. Plaintiff's Employee Status 90 day, with Plaintiff's handwritten response; 3 pages
11. Probation review dated 6/29/00; 1 page
12. Severance Agreement package dated 6/29/00; 28 pages
13. Plaintiff's written warning-work performance dated 5/1/00, 1 page
14. Plaintiff's response to written warning (with attachments) dated 5/1/00; 42 pages
15. Plan of Action dated 6/1/00; 3 pages
16. Customer Service Representative job description dated 2/2/99; 1 page
17. Customer Service Representative job description dated 11/2/99; 2 pages
18. Plaintiff's handwritten notes of 4/1/00 meeting with Patricia Roberts and Chante Bynes (with attachments); 6 pages
19. Plaintiff's handwritten notes dated 5/11/00; 1 page, (this document is lost and if and when we locate it, we will forward it to your office)
20. Departmental Phone Listing; 2 pages
21. Plaintiff's handwritten work diary from June 1999 – June 2000; 214 pages
22. Email confirmation reports; 9 pages
23. Interoffice memos to or from Plaintiff; 151 pages
24. Email transmittals re: MIS problems; 13 pages
25. Memos to Customer Service Department; 43 pages
26. Customers' written commendations to Plaintiff; 22 pages
27. Plaintiff's improvement/suggestion memos; 6 pages
28. Plaintiff's computer generated telephone logs; 240 pages
    a. July, 1999; 25 pages
    b. August, 1999; 22 pages
    c. September; 1999; 18 pages
    d. October, 1999; 20 pages
    e. November, 1999; 20 pages
    f. December, 1999; 17 pages
    g. January, 2000; 21 pages
    h. February, 2000; 20 pages
    i. March, 2000; 20 pages
    j. April, 2000; 12 pages
    k. May, 2000; 35 pages
    l. June, 2000; 28 pages
29. Computer generated telephone logs for Plaintiff's co-workers; 92 pages
    a. Sandy Landro; 11 pages
    b. Joyce Carr; 6 pages
    c. Herta Page; 23 pages
    d. Donna McCausland; 10 pages
    e. Diane Saksa; 42 pages
30. Overtime batch letter labels; 10 pages

31.  Plaintiff's daily work June 1999 [reflected through telephone inquiry forms, order inquiry forms, order forms, return authorization forms, invoice inquiry forms, shipping order forms, purchase order forms, invoice/credit memos, invoice/debit memos, rapid load purchase order forms, print key output forms, EDI invoices, UPS tracking summary forms, bills of lading, expedite request forms, fed ex airbill receipts, item inventory requirement by requested ship date forms, open stock forms]; 18 pages
32.  July, 1999; 81 pages
33.  August, 1999; 237 pages
34.  September, 1999; 78 pages
35.  October, 1999; 118 pages
36.  November, 1999; 186 pages
37.  December, 1999; 151 pages
38.  January, 2000; 255 pages
39.  February, 2000; 115 pages
40.  March, 2000; 86 pages
41.  April, 2000; 139 pages
42.  May, 2000; 508 pages
43.  June, 2000; (attached hereto) 301 pages
44.  Pilot Training Program Manual; 200 pages
45.  Supplemental Program Manual; 124 pages
46.  Plaintiff's handwritten telephone logs (before Defendant required computer generated telephone logs); 189 pages
47.  Herta Pages' deleted orders; 16 pages
48.  Pilot telephone bill; 4 pages
49.  Plaintiff's Dept of Labor claim documentation; 24 pages
50.  Orders on hold; 6 pages
51.  Plaintiff's timesheets, August, 1999 through June 2000; 27 pages
52.  Diane Saksa's international accounts assignments; 33 pages
53.  Sandy Landro's EDI accounts assignments; 29 pages
54.  blank forms; 13 pages
55.  commercial products list; 13 pages
56.  <u>Plaintiff's mitigation efforts after termination from Defendant corporation; 151 pages (21 new pages with this mailing)</u>
57.  <u>Plaintiff's income tax returns for 2000-2002; 24 pages</u>
58.  Order File Summary reports; 21 pages  See Exhibit _____, Deposition Transcripts for Lila R. Davis, January 22, 2004, pages 154, 156, 159.

_Lila R. Davis_

Subscribed and sworn to before me this ___16th___ day of August, 2004

Notary Public          Earl J. William

My Commission Expires:  _Commissioner of the Superior Court_

<u>CERTIFICATION</u>

A copy of the foregoing affidavit was sent by U.S. mail, first class, on August 16,

2004 to the following:

Alison Jacobs Wice, Esq.
Jackson Lewis, LLP
177 Broad Street
Stamford, CT 06904


_____
MAX F. BRUNSWICK