UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LILA DAVIS,                          :
                                     :
     Plaintiff,                      :
                                     :
     v.                              :     No. 3:01CV2204(DJS)
                                     :
PILOT CORPORATION OF AMERICA,        :
                                     :
     Defendant.                      :
                                     :

MEMORANDUM OF DECISION

On October 29, 2001, plaintiff Lila Davis filed this action
alleging that defendant, Pilot Corporation of America ("Pilot"),
her employer, discriminated against her on the basis of her race
in violation of Title VII of the Civil Rights Act, codified at 42
U.S.C. § 2000e et seq. On March 1, 2004, pursuant to Rule 56(b)
of the Federal Rules of Civil Procedure, Pilot filed a motion for
summary judgment (dkt. # 61). For the reasons set forth herein,
Pilot's motion is **GRANTED.**

I. FACTS

Plaintiff Lila Davis is an African-American woman. Davis
claims that from April of 2000 until June of 2000, she suffered
harassment from her supervisors Patricia Roberts and John
Ferrara. Ferrara is Pilot's Customer Service Manager, and the
head of the Customer Service Department. Roberts was Davis's
immediate supervisor for the period of Davis's employment during
which she claims she was subjected to the harassment. Davis

claims that this harassment was motivated by her race and color.
In addition, Davis claims that Pilot's decision to terminate her
employment on June 29, 2000 was motivated by her race and color.

Pilot hired Davis as a Customer Service Representative
("CSR") through a temporary employment agency on June 14, 1999.[1]
On August 17, 1999, Davis was hired by Ferrara and Judith
DeZenzio as a full time CSR.  DeZenzio was Davis's immediate
supervisor from June of 1999 until March of 2000.  Roberts
replaced DeZenzio as Davis's immediate supervisor in April of
2000, and remained Davis's immediate supervisor until her
termination in June of 2000.

Davis's CSR position required that she perform several tasks
each day.  Primarily, Davis entered customer orders into Pilot's
computer system.  Entering orders involved Davis preparing the
order and then entering the order into the computer system.
Preparing an order could take between five and twenty minutes,
while entering an order into the system required significantly
less time.  Frequently, orders were put on hold for a variety of
reasons.  CSRs were rarely, if ever, responsible for an order
being put on hold.  Such an order could not be entered into the
system until the problem was resolved.  Davis also responded to

---

[1] During that same month, Pilot  terminated the employment
of Peggy Anne Kelley, a Caucasian CSR, for failing to enter an
average of twenty one to twenty two orders per day.  (See Dkt. #
63, ¶ 7).

-2-

customer complaints and inquiries, completed customer address labels, mailed product fact sheets to customers, mailed courtesy product samples, and answered customer phone calls. Finally, Davis, on her own initiative, documented her daily tasks in a diary.

On Davis's first day, she was given a tour of the office by Ferrara. Ferrara introduced Davis to a number of employees in the Customer Service Department. During the course of that tour, Ferrara mentioned to Davis that he had not introduced her to Wendy Jennings, an African-American member of the Customer Service Department, because she was on vacation. Nevertheless, Ferrara suggested that he was certain that the two "would get along." (Dkt. #88, ¶ 20). At some point during her tenure at Pilot, Ferrara expressed "his displeasure" that Davis and Jennings were socializing; Ferrara suggested that Jennings might unduly influence Davis with her "opinion about occurrences in the department that took place before [Davis] was hired." (Dkt. # 88, ¶ 21). Davis claims that the "occurrences" about which Ferrara spoke were "racially charged conversations [Ferrara] had with Jennings". (Id.).

From June of 1999 through March of 2000, DeZenzio completed two evaluations of Davis's work. Both evaluations cited the slow rate of speed with which Davis entered orders into the computer system. In the first review, however, DeZenzio states that Davis

-3-

utilized her first ninety days on the job well, and was "on her way to becoming a very valued member of the Customer Service Team." (Dkt #89, Ex. 18).  In the second review of Davis's work, written in March of 2000, DeZenzio again noted Davis's limitations concerning order entry.  Nevertheless, DeZenzio's affidavit suggests that CSRs often "fall behind in their order entry work."  (Dkt # 89, ¶ 21).

Patricia Roberts replaced DeZenzio on April 1, 2000.  In an effort to make CSR processing more efficient, Roberts gathered and analyzed order processing records by individual CSRs from the previous month, and thereafter from the previous year.  In addition, Roberts required each CSR to report to her the number of orders they entered and the number of telephone calls they handled each day.  As a result, she determined that each CSR should be able to complete the following amount of work in a day: (1) manually enter an average of twenty orders; (2) respond to between twenty and twenty-five consumer letters; and (3) answer the daily volume of telephone calls, which usually varied between five and fifteen inbound calls per CSR.

Davis met with Roberts on April 4, 2000. Prior to that meeting, Roberts noticed that Davis's work assignments were often redistributed to other CSRs.  That day, Roberts met with Davis at Davis's work station for ninety minutes and requested that Davis demonstrate how she performed her duties.  After completing this

assignment, Roberts complimented Davis on her performance.

Soon thereafter, Roberts began to change Davis's work routine.  In addition to Davis's regular work load, Roberts required Davis to prepare for entry, but not enter, between ten and twenty orders each day.  After Davis completed this task, Roberts entered the orders into the system herself.  As a result, Roberts received credit for the order entry rather than Davis. Davis was the only CSR required to prepare additional orders. Davis was also required to prepare orders for temporary employees Erin Sanchez and Jaime Leito without receiving credit for her work.  Davis was the only CSR required to prepare orders for these temporary employees.  Further, Roberts required Davis to fax written confirmation to customers that their orders had been received.  Some of these confirmations related to orders entered by other CSRs.  Davis was the only CSR required to perform this duty.  Finally, Davis was required to prepare packages for Brenda Smorto and Jeanette Hirsch during her regular work hours while other CSRs were granted overtime to perform this duty.[2]

On April 10, 2000, Roberts expressed concern to Davis that Davis was not meeting the daily average for order entry, was talking too much with fellow CSR Diane Saska, and had arrived late on one occasion.  Soon thereafter, Davis requested a meeting

---

[2] Wendy Jennings, an African-American employee, was permitted to use overtime to complete this work.

with the Human Resources Department regarding the comments that Roberts had made about her work and behavior.  In anticipation of this meeting, Davis prepared a document suggesting that Roberts was treating her unfairly.  In particular, Davis claimed that Roberts did not speak to Saska about the time she spent talking to Davis, and that Roberts had not reprimanded the Caucasian co-worker with whom Davis had arrived late.

On or about April 11, 2000, Davis met with Roberts and Chantay Bynes, an African-American member of Pilot's Human Resources Department.  At that meeting, Roberts stated that she wanted to get a fresh start with Davis, and Davis found Bynes to be sincerely concerned about her.  In addition, Roberts agreed to provide additional training to Davis.  Finally,  Roberts told Davis that she was expected to average twenty order entries per day while Davis agreed to tell Roberts if she was falling behind in her work.

The April 11 meeting did not improve Davis's performance, and on May 1, 2000, Roberts issued a written warning to Davis.  Shortly thereafter, Davis wrote a rebuttal asking that the warning be retracted.  In response to Davis's rebuttal, Bynes and Roberts met with Davis.  During the meeting, Davis claimed that Roberts's interruptions were interfering with her ability to work.  Davis was advised that she had thirty days to improve her performance.

-6-

On May 8, 2000, Davis met with Roberts, Bynes, and Ferrara to discuss Davis's performance.  During this meeting, Bynes told Davis that if Davis were unhappy with her job, she should consider looking for a new position.  Ferrara reminded Davis that she was expected to meet the production standards required of all CSRs.  Following this meeting, Davis emailed Roberts asking her to clarify Pilot's expectations.  Roberts responded that she was expected to complete a batch of twenty customer inquiries in an hour and a half and enter twenty orders per day.  On May 24, 2000, Roberts advised Davis that she was still failing to keep up with her assigned work and that she must improve her performance in the next two weeks or her employment would be terminated. Roberts also asked Davis if she had suggestions for any other steps Pilot could take to help her to improve.

At the conclusion of the thirty-day review period, Laurie Faulkner, Pilot's Human Resources Director, and Roberts met with Davis to discuss their ongoing concern with Davis's work.[3] During that meeting, the group reviewed the steps that Roberts had taken to help Davis increase the number of orders she entered each day.  These measures included providing Davis with a new calculator that contained a line-item printout option, and allowing Davis to "batch" groups of orders together before keying

---

[3] During the month of May, Davis averaged 10.4 orders per day.

-7-

them.  Upon review, Pilot gave Davis an additional two weeks to improve her performance and reminded Davis that she was expected to enter an average of twenty orders per day. Further, Davis was required to check in with Roberts each day to report the status of her work.  During the month of June, Davis averaged 8.5 order entries per day.

Davis was terminated on June 29, 2000.  Her notice of termination came in the form of a letter from Ferrara that cited her inability and unwillingness to improve her performance.  (See Dkt. # 66, Ex. 7).  Following Davis's termination, Pilot promoted Jennings to fill Davis's former position.

## II.  DISCUSSION

Davis complains, inter alia, that the Pilot  subjected her to unfair scrutiny, constant harassment, and ultimately terminated her employment in violation of Title VII of the Civil Rights Act of 1964.  The factual basis for Davis's claims is that she was subject to harassment from her supervisors, Ferrara and Roberts, and that Pilot terminated her employment because of her race and color.  Because the record is devoid of any evidence that the harassment and eventual termination was based upon an impermissible classification, Davis cannot, as a matter of law, prove illegal discrimination.

-8-

A.   STANDARD

A motion for summary judgment may be granted "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue of material fact and that the
moving party is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(c).  Summary judgment is appropriate if, after
discovery, the nonmoving party "has failed to make a sufficient
showing on an essential element of [its] case with respect to
which [it] has the burden of proof."  Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to
demonstrate the absence of any material factual issue genuinely
in dispute.'"  American Int'l Group, Inc. v. London Am. Int'l
Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v.
Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir.
1975)).  A dispute concerning a material fact is genuine "'if
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist.,
963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all
inferences and ambiguities in a light most favorable to the
nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d
Cir. 1991).  "Only when reasonable minds could not differ as to
the import of the evidence is summary judgment proper."  Id.

-9-

B.  DISCRIMINATION CLAIMS

Davis alleges that she was subject to unfair scrutiny, constant harassment, and that her employment was terminated in violation of Title VII of the Civil Rights Act. Pilot contends that Davis was never subjected to racial harassment, and that she was terminated because she was unable to perform her duties as a CSR.  Because Davis has not offered sufficient evidence to create a genuine issue of material fact, Pilot's motion for summary judgment on Davis's discrimination claims is granted.

In <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), the Supreme Court established an "allocation of the burden of production and an order for the presentation of proof in Title VII cases."  Under that framework, a plaintiff alleging a violation of the discrimination statutes establishes a <u>prima facie</u> case by showing she:  (1) was a member of a protected class; (2) was qualified for the position she held; (3) suffered an adverse employment action; (4) in circumstances giving rise to an inference of discrimination.  <u>See</u> <u>Schnabel v. Abrahmson</u>, 232 F.3d 83, 87 (2d Cir. 2000); <u>see also</u> <u>Texas Dept. Of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1985) ("Plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.").  If the plaintiff establishes a <u>prima</u> <u>facie</u>

case, the employer has the burden of articulating a "legitimate, nondiscriminatory reason" for the adverse employment action. Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2d Cir. 1997). If the employer does so, the plaintiff must prove by a preponderance of the evidence that the employer's proffered explanation is unworthy of credence, and that the true reason for the employer's action was discrimination. See id.

Davis cannot, as a matter of law, establish that Pilot's actions were the product of illegal discrimination.[4] The ultimate question in an employment discrimination case is whether the evidence offered can reasonably and logically give rise to an inference of discrimination under all of the circumstances. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000); Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999). Davis has not submitted sufficient evidence in support of her claim of discrimination. Pilot has met its burden by offering substantial evidence that it terminated Davis's employment because of her inability to perform her responsibilities as a CSR. Specifically, the evidence shows that Davis consistently failed to meet Pilot's expectations regarding

---

[4] Pilot contends that Davis was not qualified to hold her position, and therefore cannot establish a prima facie case of discrimination. Since Davis's burden when attempting to make out a prima facie case is de minimis, see McDonnell Douglas Corp., 411 U.S. at 802, the court cannot find that, as a matter of law, Davis has failed to establish a prima facie case of discrimination.

order entry, and that her supervisor's dissatisfaction with her productivity, and not illegal discrimination, was the reason for her termination.

Pilot's legitimate, non-discriminatory reason for terminating Davis's employment is supported by the record.  The record includes evidence of the average number of daily order entries for each CSR, tracked by month.  These averages show that Davis's order entry was lower than most of her fellow CSRs before and after Roberts arrived.  Moreover, the record clearly demonstrates that Davis was aware that Pilot expected her to improve her average.  Pilot has produced a formal warning issued by Roberts to Davis regarding her performance.  The record further reflects that Roberts and Ferrara issued Davis a number of informal warnings  This offer of proof is sufficient to meet Pilot's burden at this stage in the analysis.  See Reeves, 530 U.S. at 142 ("the burden is one of production, not persuasion").

Pilot's specific and substantiated proffer forces Davis to counter with evidence of pretext in order to prove discrimination.  As a matter of law, Davis is unable to demonstrate that Pilot's proffered reason is pretextual.  Davis claims that she was the only CSR subject to a quota and that she was given additional tasks designed to prohibit her from meeting this quota.  Davis asserts that Pilot deliberately prevented her

-12-

from meeting the stated order entry average by requiring her to complete these additional assignments.

Examining the record as a whole, Davis's assertions do not, as a matter of law, establish pretext. The record does not support Davis's claim that she was the only CSR required to meet the applicable standards and that she was given additional tasks designed to prevent her from meeting those standards. Pilot terminated the employment of a Caucasian CSR for not meeting a comparable standard shortly before Davis began working for Pilot. Moreover, Joyce Carre, a Caucasian CSR with comparable order entry numbers to Davis, left Pilot due to a conflict with Roberts. Davis admits that this conflict was the result of Carre's job performance. (See Dkt. # 66, Tab A at 88:18-21). Similarly, the record does not reflect that Pilot assigned Davis additional tasks to prevent her from meeting their standards. Instead, the record shows that Pilot gave Davis several opportunities to improve her performance. These opportunities include providing Davis with additional training and extending her thirty-day review period despite her inability to improve her performance. Thus, Davis's claim that Pilot deliberately prevented her from meeting the applicable standards is not sufficient to create a genuine issue of material fact.

Even if Davis's assertions did establish pretext, which they do not, there is still not sufficient evidence to give rise to an

-13-

inference of discrimination.  The only evidence of discrimination
is Davis's offer of a vague reference by Ferrara regarding two
racially charged incidents that may have occurred before Davis
began working for Pilot.  The nature of these incidents is not
explicitly set forth in the record; in any event, these incidents
do not have any relation to Davis's termination.  Likewise,
Ferrara's comment about Davis's friendship with Jennings is too
vague and ambiguous to prove racial animus.  Beyond those
statements, Davis has produced no evidence that her race or color
motivated the decision to terminate her employment.  See
Schnabel, 232 F.3d at 88 ("In fact, beyond the minimal proof
required to state a prima facie case, Schnabel has offered no
evidence that he was discriminated against because of his age.").
She relies on a few, random instances where she was treated
differently than Caucasian CSRs.  Davis's assertion that these
events were the result of discrimination is conclusory, and does
not give rise to an inference of discrimination.  See
Bickerstaff, 196 F. 3d. at 448 ("[A]n inference is not a
suspicion or a guess.  It is a reasoned, logical decision to
conclude that a disputed fact exists on the basis of another fact
[that is know to exist].") (quoting 1 Leonard B. Sand, et al.,
Modern Federal Jury Instructions at 6.01 (1997))(internal
quotation marks omitted).  On the contrary, Ferrara, the person
responsible for hiring Davis, (see dkt. # 66, Tab A at 64:8-10),

-14-

was also the person who ultimately terminated her employment. This fact strongly suggests that "invidious discrimination was unlikely." Schnabel, 232 F.3d at 91; see Grady v. Affiliated Cent., Inc., 130 F.3d. 553, 560 (2d Cir. 1997) ("[W]here the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.").[5] The evidence Davis offers cannot, as a matter of law, rebut Pilot's evidence of Davis's failure to satisfy her supervisor's legitimate expectations.

In consideration of the evidence offered, Davis's claim fails as a matter of law, as the sum total of her evidence is insufficient to establish pretext or give rise to an inference of discrimination.[6] Therefore, there is no genuine issue of material fact for a jury to decide.

---

[5] In addition, Pilot replaced Davis with Jennings, an African-American.

[6] To the extent that Davis asserts a claim of hostile work environment, that claim fails, as a matter of law, because Davis has offered insufficient evidence to meet her burden. See Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002) (holding that, in order to prevail on a hostile work environment claim, plaintiff must demonstrate that "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms of plaintiff's employment were thereby altered.") (citing Leibovitz v. N.Y. Transit Authority, 252 F.3d 179, 188 (2d Cir. 2001)).

## III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (dkt. # 61) is **GRANTED**.  Judgment for the defendant shall enter on all counts of the complaint.  The Clerk of the Court shall close this file.

So ordered this 1st day of August, 2005.

                                        **/s/DJS**
                    _____
                            **DOMINIC J. SQUATRITO**
                       **UNITED STATES DISTRICT JUDGE**

-16-